(Slip Opinion)   OCTOBER TERM, 2006   1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ENVIRONMENTAL DEFENSE ET AL. *v.* DUKE ENERGY CORP. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 05–848.   Argued November 1, 2006—Decided April 2, 2007

In the 1970s, Congress added two air pollution control schemes to the Clean Air Act (Act): New Source Performance Standards (NSPS) and Prevention of Significant Deterioration (PSD), each of which covers modified, as well as new, stationary sources of air pollution. The NSPS provisions define "modification" of such a source as a physical change to it, or a change in the method of its operation, that increases the amount of a pollutant discharged or emits a new one. 42 U. S. C. §7411(a)(4). The PSD provisions require a permit before a "major emitting facility" can be "constructed," §7475(a), and define such "construction" to include a "modification (as defined in [NSPS])," §7479(2)(C). Despite this definitional identity, the Environmental Protection Agency's (EPA) regulations interpret "modification" one way for NSPS but differently for PSD. The NSPS regulations require a source to use the best available pollution-limiting technology, see *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 846, when a modification would increase the discharge of pollutants measured in kilograms per hour, 40 CFR §60.14(a), but the 1980 PSD regulations require a permit for a modification only when it is a "major" one, §51.166(b)(2)(i), and only when it would increase the actual annual emission of a pollutant above the actual average for the two prior years, §51.166(b)(21)(ii).

After respondent Duke Energy Corporation replaced or redesigned the workings of some of its coal-fired electric generating units, the United States filed this enforcement action, claiming, among other things, that Duke violated the PSD provisions by doing the work without permits. Petitioner environmental groups intervened as plaintiffs and filed a complaint charging similar violations. Duke

moved for summary judgment, asserting, *inter alia*, that none of its projects was a "major modification" requiring a PSD permit because none increased hourly emissions rates. Agreeing, the District Court entered summary judgment for Duke on all PSD claims. The Fourth Circuit affirmed, reasoning that Congress's decision to create identical statutory definitions of "modification" in the Act's NSPS and PSD provisions affirmatively mandated that this term be interpreted identically in the regulations promulgated under those provisions. When the court *sua sponte* requested supplemental briefing on the relevance of this Court's decision in *Rowan Cos.* v. *United States*, 452 U. S. 247, 250, that the Government could not adopt different interpretations of the word "wages" in different statutory provisions, plaintiffs injected a new issue into the case, arguing that a claim that the 1980 PSD regulation exceeded statutory authority would be an attack on the regulation's validity that could not be raised in an enforcement proceeding, see 42 U. S. C. §7607(b)(2), since judicial review for validity can be obtained only by a petition to the District of Columbia Circuit, generally within 60 days of EPA's rulemaking, §7607(b)(1). The Fourth Circuit rejected this argument, ruling that its interpretation did not invalidate the PSD regulations because they can be interpreted to require an increase in the hourly emissions rate as an element of a major "modification."

*Held:* The Fourth Circuit's reading of the PSD regulations in an effort to conform them with their NSPS counterparts on "modification" amounted to the invalidation of the PSD regulations, which must comport with the Clean Air Act's limits on judicial review of EPA regulations for validity. Pp. 8–17.

(a) Principles of statutory interpretation do not rigidly mandate identical regulation here. Because "[m]ost words have different shades of meaning and consequently may be variously construed, [even] when [they are] used more than once in the same statute or . . . section," the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning . . . is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427, 433. A given term in the same statute may take on distinct characters from association with distinct statutory objects calling for different ways of implementation. The point is the same even when the terms share a common statutory definition, if it is general enough. See *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 343–344. *Robinson* is not inconsistent with *Rowan,* where the Court's invalidation of the differing interpretations of "wages," 452

U. S., at 252, turned not on the fact that a "substantially identical" definition of that word appeared in each of the statutory provisions at issue, but on the failure of the regulations in question to serve Congress's manifest "concern for the interest of simplicity and ease of administration," *id.,* at 255. In fact, in a case close to *Rowan*'s facts, the Court recently declined to follow a categorical rule of resolving ambiguities in identical statutory terms identically regardless of their surroundings, *United States* v. *Cleveland Indians Baseball Co.,* 532 U. S. 200, 213, but instead accorded "substantial judicial deference" to an agency's "longstanding," "reasonable," and differing interpretations of the statutory term at issue, *id.,* at 218–220. It makes no difference here that the Clean Air Act does not merely repeat the same definition in its NSPS and PSD provisions, but that the PSD provisions refer back to the section defining "modification" for NSPS purposes. Nothing in the text or legislative history of the statutory amendment that added the NSPS cross-reference suggests that Congress meant to eliminate customary agency discretion to resolve questions about a statutory definition by looking to the surroundings in which the defined term appears. EPA's construction need do no more than fall within the outer limits of what is reasonable, as set by the Act's common definition. Pp. 9–12.

(b) The Fourth Circuit's construction of the 1980 PSD regulations to conform them to their NSPS counterparts was not a permissible reading of their terms. The PSD regulations clearly do not define a "major modification" in terms of an increase in the "hourly emissions rate." On its face, the definitional section specifies no rate at all, hourly or annual, merely requiring a "physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any" regulated pollutant. 40 CFR §51.166(b)(2)(i). But even when the regulations mention a rate, it is annual, not hourly. See, *e.g.,* §51.166(b)(23)(i). Further at odds with the idea that hourly rate is relevant is the mandate that "[a]ctual emissions shall be calculated using the unit's actual operating hours," §51.166(b)(21)(ii)*,* since "actual emissions" must be measured in a manner looking to the number of hours the unit is or probably will be actually running. The Court of Appeals's reasons for its different view are no match for these textual differences. Consequently, the Court of Appeals's construction of the 1980 PSD regulations must be seen as an implicit invalidation of those regulations, a form of judicial review implicating the provisions of §7607(b), which limit challenges to the validity of a regulation during enforcement proceedings when such review "could have been obtained" in the Court of Appeals for the District of Columbia within 60 days of EPA rulemaking. Because the Court of Appeals did not be-

lieve that its analysis reached validity, it did not consider the applicability or effect of that limitation here.  The Court has no occasion itself at this point to consider the significance of §7607(b).  Pp. 12–17.

(c) Duke's claim that, even assuming the Act and the 1980 regulations authorize EPA to construe a PSD "modification" as it has done, EPA has been inconsistent in its positions and is now retroactively targeting 20 years of accepted practice was not addressed below.  To the extent the claim is not procedurally foreclosed, Duke may press it on remand.  P. 17.

411 F. 3d 539, vacated and remanded.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, SCALIA, KENNEDY, GINSBURG, BREYER, and ALITO, JJ., joined, and in which THOMAS, J., joined as to all but Part III–A. THOMAS, J., filed an opinion concurring in part.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–848

ENVIRONMENTAL DEFENSE, ET AL., PETITIONERS *v.* DUKE ENERGY CORPORATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[April 2, 2007]

JUSTICE SOUTER delivered the opinion of the Court.

In the 1970s, Congress added two air pollution control schemes to the Clean Air Act: New Source Performance Standards (NSPS) and Prevention of Significant Deterioration (PSD), each of them covering modified, as well as new, stationary sources of air pollution. The NSPS provisions define the term "modification," 42 U. S. C. §7411(a)(4), while the PSD provisions use that word "as defined in" NSPS, §7479(2)(C). The Court of Appeals concluded that the statute requires the Environmental Protection Agency (EPA) to conform its PSD regulations on "modification" to their NSPS counterparts, and that EPA's 1980 PSD regulations can be given this conforming construction. We hold that the Court of Appeals's reading of the 1980 PSD regulations, intended to align them with NSPS, was inconsistent with their terms and effectively invalidated them; any such result must be shown to comport with the Act's restrictions on judicial review of EPA regulations for validity.

I

The Clean Air Amendments of 1970, 84 Stat. 1676,

broadened federal authority to combat air pollution, see *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 845–846 (1984), and directed EPA to devise National Ambient Air Quality Standards (NAAQS) limiting various pollutants, which the States were obliged to implement and enforce, 42 U. S. C. §§7409, 7410. The amendments dealing with NSPS authorized EPA to require operators of stationary sources of air pollutants to use the best technology for limiting pollution, *Chevron*, *supra,* at 846; see also 1 F. Grad, Environmental Law §2.03, p. 2–356 (2006), both in newly constructed sources and those undergoing "modification," 42 U. S. C. §7411(a)(2). Section 111(a) of the 1970 amendments defined this term within the NSPS scheme as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted," 42 U. S. C. §7411(a)(4).

EPA's 1975 regulations implementing NSPS provided generally that "any physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which a standard applies shall be considered a modification within the meaning of [S]ection 111." 40 CFR §60.14(a) (1976). Especially significant here is the identification of an NSPS "modification" as a change that "increase[s] . . . the emission rate," which "shall be expressed as kg/hr of any pollutant discharged into the atmosphere." §60.14(b).[1]

_____

[1] EPA's 1975 NSPS regulations did not specify that the "rate" means the maximum rate possible for the technology, see 40 CFR §§60.14(a)–(b) (1977), but the parties all read the regulations this way. See Brief for Petitioners 2; Brief for United States 7; Brief for Respondent Duke 32. At another point in the NSPS regulations, a different definition of "modification" appeared: "'Modification' means any physical change in, or change in the method of operation of, an existing facility which increases the

NSPS, however, did too little to "achiev[e] the ambitious goals of the 1970 Amendments," R. Belden, Clean Air Act 7 (2001) (hereinafter Belden), and the Clean Air Act Amendments of 1977, 91 Stat. 685, included the PSD provisions, which aimed at giving added protection to air quality in certain parts of the country "notwithstanding attainment and maintenance of" the NAAQS. 42 U. S. C. §7470(1).[2] The 1977 amendments required a PSD permit before a "major emitting facility" could be "constructed" in an area covered by the scheme. §7475(a). As originally enacted, PSD applied only to newly constructed sources, but soon a technical amendment added the following subparagraph: "The term 'construction' when used in connection with any source or facility, includes the modification (as defined in [S]ection 111(a)) of any source or facility." §14(a)(54), 91 Stat. 1402, 42 U. S. C. §7479(2)(C); see also *New York* v. *EPA*, 413 F. 3d 3, 13 (CADC 2005). In other words, the "construction" requiring a PSD permit under the statute was made to include (though it was not limited to) a "modification" as defined in the statutory NSPS provisions.

In 1980, EPA issued PSD regulations,[3] which "limited the application of [PSD] review" of modified sources to

———————

amount of any air pollutant (to which a standard applies) emitted into the atmosphere by that facility," §60.2(h); see also *New York* v. *EPA*, 413 F. 3d 3, 11–12 (CADC 2005) *(per curiam)* ("[N]either the 1975 regulation nor its preamble explained why EPA found it necessary to offer these two separate glosses on 'modification'").

　[2] Statutory PSD superseded a regulatory PSD scheme established by EPA in 1974. See 39 Fed. Reg. 42510. Under the regulations, the term "modification" was defined as "any physical change in, or change in the method of operation of, a stationary source which increases the emission rate of any pollutant for which a national standard has been promulgated." *Id.*, at 42514.

　[3] Although EPA had promulgated an earlier set of PSD regulations in 1978, 43 Fed. Reg. 26380, none of the parties argues that they govern the conduct at issue in this case.

instances of "'major' modificatio[n]," Belden  46, defined as "any physical change in or change in the method of opera- tion of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act."  40 CFR §51.166(b)(2)(i) (1987).  Further regulations in turn addressed various elements of this definition, three of which are to the point here.  First, the regulations specified that an operational change consisting merely of "[a]n increase in the hours of operation or in the production rate" would not generally constitute a "physical change or change in the method of operation."  §51.166(b)(2)(iii)(*f*).  For purposes of a PSD permit, that is, such an operational change would not amount to a "modification" as the Act defines it.  Second, the PSD regulations defined a "net emissions increase" as "[a]ny increase in actual emissions from a particular physical change or change in the method of operation," net of other contemporaneous "increases and decreases in actual emissions at the source."  §51.166(b)(3).  "Actual emissions" were defined to "equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source opera- tion."  §51.166(b)(21)(ii).  "[A]ctual emissions" were to be "calculated using the unit's actual operating hours [and] production rates."  *Ibid.*  Third, the term "significant" was defined as "a rate of emissions that would equal or exceed" one or another enumerated threshold, each expressed in "tons per year."  §51.166(b)(23)(i).

It would be bold to try to synthesize these statutory and regulatory provisions in a concise paragraph, but three points are relatively clear about the regime that covers this case:

> (a) The Act defines modification of a stationary source of a pollutant as a physical change to it, or a change in the method of its operation, that increases

the amount of a pollutant discharged or emits a new one.

(b) EPA's NSPS regulations require a source to use the best available pollution-limiting technology only when a modification would increase the rate of discharge of pollutants measured in kilograms per hour.

(c) EPA's 1980 PSD regulations require a permit for a modification (with the same statutory definition) only when it is a major one and only when it would increase the actual annual emission of a pollutant above the actual average for the two prior years.

The Court of Appeals held that Congress's provision defining a PSD modification by reference to an NSPS modification caught not only the statutory NSPS definition, but also whatever regulatory gloss EPA puts on that definition at any given time (for the purposes of the best technology requirement). When, therefore, EPA's PSD regulations specify the "change" that amounts to a "major modification" requiring a PSD permit, they must measure an increase in "the amount of any air pollutant emitted," 42 U. S. C. §7411(a)(4), in terms of the hourly rate of discharge, just the way NSPS regulations do. Petitioners and the United States say, on the contrary, that when EPA addresses the object of the PSD scheme it is free to put a different regulatory interpretation on the common statutory core of "modification," by measuring increased emission not in terms of hourly rate but by the actual, annual discharge of a pollutant that will follow the modification, regardless of rate per hour. This disagreement is the nub of the case.

II

Respondent Duke Energy Corporation runs 30 coal-fired electric generating units at eight plants in North and South Carolina. *United States* v. *Duke Energy Corp.*, 411 F. 3d 539, 544 (CA4 2005). The units were placed in ser-

vice between 1940 and 1975, and each includes a boiler containing thousands of steel tubes arranged in sets. *Ibid.* Between 1988 and 2000,[4] Duke replaced or redesigned 29 tube assemblies in order to extend the life of the units and allow them to run longer each day. *Ibid.*

The United States filed this action in 2000, claiming, among other things, that Duke violated the PSD provisions by doing this work without permits. Environmental Defense, North Carolina Sierra Club, and North Carolina Public Interest Research Group Citizen Lobby/Education Fund intervened as plaintiffs and filed a complaint charging similar violations.

Duke moved for summary judgment, one of its positions being that none of the projects was a "major modification" requiring a PSD permit because none increased hourly rates of emissions. The District Court agreed with Duke's reading of the 1980 PSD regulations. It reasoned that their express exclusion of "[a]n increase in the hours of operation" from the definition of a "physical change or change in the method of operation" implied that "post-project emissions levels must be calculated assuming" pre-project hours of operation. 278 F. Supp. 2d 619, 640–641 (MDNC 2003). Consequently, the District Court said, a PSD "major modification" can occur "only if the project increases the hourly rate of emissions." *Id.*, at 641. The District Court found further support for its construction of the 1980 PSD regulations in one letter and one memoran-

─────────────

[4] The United States argues that some of Duke's projects were governed by EPA's PSD regulations promulgated in 1992 rather than the 1980 PSD regulations. Brief for United States 20, n. 4. Duke disputes this. Brief for Respondent Duke 14, n. 4. Because the United States acknowledges that the two sets of regulations "did not materially differ with respect to the legal question at issue here," Brief for United States 20, n. 4, we will assume, as did the Court of Appeals and the District Court, that the 1980 PSD regulations control. 411 F. 3d, at 543, n. 1; *United States* v. *Duke Energy Corp.*, 278 F. Supp. 2d 619, 629 (MDNC 2003).

dum written in 1981 by EPA's Director of the Division of Stationary Source Enforcement, Edward E. Reich. *Id.,* at 641–642.

The United States and intervenor-plaintiffs (collectively, plaintiffs) subsequently stipulated "that they do not contend that the projects at issue in this case caused an increase in the maximum hourly rate of emissions at any of Duke Energy's units." App. 504. Rather, their claim "is based solely on their contention that the projects would have been projected to result in an increased utilization of the units at issue." *Ibid.* Duke, for its part, stipulated to plaintiffs' right to appeal the District Court's determination that projects resulting in greater operating hours are not "major modifications" triggering the PSD permit requirement, absent an increase in the hourly rate of emissions. The District Court then entered summary judgment for Duke on all PSD claims.

The Court of Appeals for the Fourth Circuit affirmed, "albeit for somewhat different reasons." 411 F. 3d, at 542. "[T]he language and various interpretations of the PSD regulations . . . are largely irrelevant to the proper analysis of this case," reasoned the Court of Appeals, "because Congress' decision to create identical statutory definitions of the term 'modification'" in the NSPS and PSD provisions of the Clean Air Act "has affirmatively mandated that this term be interpreted identically" in the regulations promulgated under those provisions. *Id.,* at 547, n. 3, 550. The Court of Appeals relied principally on the authority of *Rowan Cos.* v. *United States*, 452 U. S. 247, 250 (1981), where we held against the Government's differing interpretations of the word "wages" in different tax provisions. 411 F. 3d, at 550. As the Court of Appeals saw it, *Rowan* establishes an "effectively irrebuttable" presumption that PSD regulations must contain the same conditions for a "modification" as the NSPS regulations,

including an increase in the hourly rate of emissions.[5]  411 F. 3d, at 550.

As the Court of Appeals said, Duke had not initially relied on *Rowan*, see 411 F. 3d, at 547, n. 4, and when the Court *sua sponte* requested supplemental briefing on *Rowan*'s relevance, plaintiffs injected a new issue into the case.  They argued that a claim that the 1980 PSD regulation exceeded statutory authority would be an attack on the validity of the regulation that could not be raised in an enforcement proceeding.  See 42 U. S. C. §7607(b)(2).  Under §307(b) of the Act, they said, judicial review for validity can be obtained only by a petition to the Court of Appeals for the District of Columbia Circuit, generally within 60 days of EPA's rulemaking.  42 U. S. C. §7607(b).

The Court of Appeals rejected this argument.  "Our choice of this interpretation of the PSD regulations . . . is not an invalidation of those regulations," it said, because "the PSD regulations can be interpreted" to require an increase in the hourly emissions rate as an element of a major "modification" triggering the permit requirement.  411 F. 3d, at 549, n. 7.  To show that the 1980 PSD regulations are open to this construction, the Court of Appeals cited the conclusions of the District Court and the Reich opinions.

We granted the petition for certiorari brought by intervenor-plaintiffs, 547 U. S. __ (2006), and now vacate.

## III

The Court of Appeals understood that it was simply construing EPA's 1980 PSD regulations in a permissible

---

[5] The Court of Appeals noted that EPA was free to abandon the requirement that a "modification" be accompanied by an increase in the hourly rate of emissions, provided it did so for both the NSPS and PSD programs.  411 F. 3d, at 550–551.  In other words, the Court of Appeals raised no question about the reasonableness of the definition of "modification" in the 1980 PSD regulations, apart from its deviation from the definition contained in NSPS regulations.

way that left them in harmony with their NSPS counterpart and, hence, the Act's single definition of "modification." The plaintiffs say that the Court of Appeals was rewriting the PSD regulations in a way neither required by the Act nor consistent with their own text.

It is true that no precise line runs between a purposeful but permissible reading of the regulation adopted to bring it into harmony with the Court of Appeals's view of the statute, and a determination that the regulation as written is invalid. But the latter occurred here, for the Court of Appeals's efforts to trim the PSD regulations to match their different NSPS counterparts can only be seen as an implicit declaration that the PSD regulations were invalid as written.

## A

In applying the 1980 PSD regulations to Duke's conduct, the Court of Appeals thought that, by defining the term "modification" identically in its NSPS and PSD provisions, the Act required EPA to conform its PSD interpretation of that definition to any such interpretation it reasonably adhered to under NSPS. But principles of statutory construction are not so rigid. Although we presume that the same term has the same meaning when it occurs here and there in a single statute, the Court of Appeals mischaracterized that presumption as "effectively irrebuttable." 411 F. 3d, at 550. We also understand that "[m]ost words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section." *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427, 433 (1932). Thus, the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning . . . is not rigid and readily yields whenever there is such variation in the connection in which the

words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Ibid.* A given term in the same statute may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.

The point is the same even when the terms share a common statutory definition, if it is general enough, as we recognized in *Robinson* v. *Shell Oil Co.*, 519 U. S. 337 (1997). There the question was whether the term "employees" in §704(a) of Title VII of the Civil Rights Act of 1964 covered former employees. Title VII expressly defined the term "employee," 42 U. S. C. §2000e(f), but the definition was "consistent with either current or past employment," 519 U. S., at 342, and we held that "each section" of Title VII "must be analyzed to determine whether the context gives the term a further meaning that would resolve the issue in dispute," *id.,* at 343–344.

If *Robinson* were inconsistent with *Rowan* (on which the Court of Appeals relied), it would be significant that *Robinson* is the later case, but we read the two as compatible. In *Rowan*, the question was whether the value of meals and lodging given to employees by an employer for its own convenience should be counted in computing "wages" under the Federal Insurance Contributions Act (FICA), 26 U. S. C. §3101 *et seq.*, and the Federal Unemployment Tax Act (FUTA), 26 U. S. C. §3301 *et seq.* Treasury Regulations made this value "includable in 'wages' as defined in FICA and FUTA, even though excludable from 'wages' under the substantially identical" statutory definition of "wages" for income-tax withholding purposes. 452 U. S., at 252. Although we ultimately held that the income tax treatment was the proper one across the board, we did not see it this way simply because a "substantially identical" definition of "wages" appeared in each of the different statutory provisions. Instead, we relied on a manifest

"congressional concern for the interest of simplicity and ease of administration." *Id.,* at 255 (internal quotation marks omitted). The FICA and FUTA regulations fell for failing to "serve that interest," *id.,* at 257, not for defying definitional identity.

In fact, in a setting much like *Rowan*, we recently declined to require uniformity when resolving ambiguities in identical statutory terms. In *United States* v. *Cleveland Indians Baseball Co.*, 532 U. S. 200 (2001), we rejected the notion that using the phrase "wages paid" in both "the discrete taxation and benefits eligibility contexts" can, standing alone, "compel symmetrical construction," *id.,* at 213; we gave "substantial judicial deference" to the "long-standing," "reasonable," and differing interpretations adopted by the Internal Revenue Service in its regulations and Revenue Rulings. *Id.,* at 218–220. There is, then, no "effectively irrebuttable" presumption that the same defined term in different provisions of the same statute must "be interpreted identically." 411 F. 3d, at 550. Context counts.

It is true that the Clean Air Act did not merely repeat the term "modification" or the same definition of that word in its NSPS and PSD sections; the PSD language referred back to the section defining "modification" for NSPS purposes. 42 U. S. C. §7479(2)(C). But that did not matter in *Robinson,* and we do not see the distinction as making any difference here. Nothing in the text or the legislative history of the technical amendments that added the cross-reference to NSPS suggests that Congress had details of regulatory implementation in mind when it imposed PSD requirements on modified sources; the cross-reference alone is certainly no unambiguous congressional code for eliminating the customary agency discretion to resolve questions about a statutory definition by looking to the surroundings of the defined term, where it occurs. See *New York,* 413 F. 3d, at 19 ("So far as appears, . . . [this]

incorporatio[n] by reference [is] the equivalent of Congress's having simply repeated in the [PSD] context the definitional language used before in the NSPS context"); compare 91 Stat. 745 (expressly incorporating in an unrelated provision of the 1977 amendments "the interpretative regulation of the [EPA] Administrator . . . published in 41 Federal Register 55524–30" with specified exceptions); *New York, supra,* at 19 ("Congress's failure to use such an express incorporation of prior regulations for 'modification' cuts against" any suggestion that "Congress intended to incorporate" into the Act the "preexisting regulatory definition" of "modification"). Absent any iron rule to ignore the reasons for regulating PSD and NSPS "modifications" differently, EPA's construction need do no more than fall within the limits of what is reasonable, as set by the Act's common[6] definition.

## B

The Court of Appeals's reasoning that the PSD regulations must conform to their NSPS counterparts led the

––––––––––

[6] Duke argues that the 1977 amendments intended to incorporate EPA's definition of "modification" under the 1974 regulatory PSD program. Brief for Respondent Duke 44; see also n. 2, *supra.* We find no support for this argument in the statutory text, which refers to the statutory NSPS definition rather than the regulatory PSD definition. Although Duke correctly points out that "Congress instructed that the bulk of the pre-existing rules 'shall remain in effect,'" Brief for Respondent Duke 44 (quoting 42 U. S. C. §7478(a)), this instruction was a temporary measure "[u]ntil such time as an applicable implementation plan is in effect," §7478(a). We therefore do not read this language as a restriction on EPA's authority to interpret the statutory PSD provisions reasonably in a manner that departs from the 1974 regulations. Duke also invokes *Bragdon* v. *Abbott*, 524 U. S. 624, 631 (1998), for the proposition that "use of the pre-existing term 'modification' 'carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations.'" Brief for Respondent Duke 44. But this reasoning is unavailing here, given the existence of at least three distinct regulatory definitions of "modification" at the time of the 1977 amendments. See *supra*, at 2–3, and nn. 1, 2.

court to read those PSD regulations in a way that seems to us too far a stretch for the language used. The 1980 PSD regulations on "modification" simply cannot be taken to track the agency's regulatory definition under the NSPS.

True, the 1980 PSD regulations may be no seamless narrative, but they clearly do not define a "major modification" in terms of an increase in the "hourly emissions rate." On its face, the definition in the PSD regulations specifies no rate at all, hourly or annual, merely requiring a physical or operational change "that would result in a significant net emissions increase of any" regulated pollutant. 40 CFR §51.166(b)(2)(i). But even when a rate is mentioned, as in the regulatory definitions of the two terms, "significant" and "net emissions increase," the rate is annual, not hourly. Each of the thresholds that quantify "significant" is described in "tons per year," §51.166(b)(23)(i), and a "net emissions increase" is an "increase in actual emissions" measured against an "average" prior emissions rate of so many "tons per year." §§51.166(b)(3) and (21)(ii). And what is further at odds with the idea that hourly rate is relevant is the mandate that "[a]ctual emissions shall be calculated using the unit's actual operating hours," §51.166(b)(21)(ii), since "actual emissions" must be measured in a manner that looks to the number of hours the unit is or probably will be actually running. What these provisions are getting at is a measure of actual operations averaged over time, and the regulatory language simply cannot be squared with a regime under which "hourly rate of emissions," 411 F. 3d, at 550 (emphasis deleted), is dispositive.

The reasons invoked by the Court of Appeals for its different view are no match for these textual differences. The appellate court cited two authorities ostensibly demonstrating that the 1980 PSD regulations "can be interpreted consistently" with the hourly emissions test, the first being the analysis of the District Court in this case.

*Id.,* at 549, n. 7.  The District Court thought that an increase in the hourly emissions rate was necessarily a prerequisite to a PSD "major modification" because a provision of the 1980 PSD regulations excluded an "'increase in the hours of operation or in the production rate'" from the scope of "'[a] physical change or change in the method of operation.'"  278 F. Supp. 2d, at 640–641 (quoting 40 CFR §§51.166(b)(2)(iii)(*f*) and (3)(i)(*a*) (1987)).  The District Court read this exclusion to require, in effect, that a source's hours of operation "be held constant" when preproject emissions are being compared with postproject emissions for the purpose of calculating the "net emissions increase."  278 F. Supp. 2d, at 640.

We think this understanding of the 1980 PSD regulations makes the mistake of overlooking the difference between the two separate components of the regulatory definition of "major modification": "[1] any physical change in or change in the method of operation of a major stationary source that [2] would result in a significant net emissions increase of any pollutant subject to regulation under the Act."  §51.166(b)(2)(i); cf. *New York,* 413 F. 3d, at 11 ("[The statutory] definition requires *both* a change—whether physical or operational—*and* a resulting increase in emissions of a pollutant" (emphasis in original)); *Wisconsin Electric Power Co.* v. *Reilly*, 893 F. 2d 901, 907 (CA7 1990) (same).  The exclusion of "increase in . . . hours . . . or . . . production rate," §51.166(b)(2)(iii)(*f*), speaks to the first of these components ("physical change . . . or change in . . . method," §51.166(b)(2)(i)), but not to the second ("significant net emissions increase," *ibid*.).  As the preamble to the 1980 PSD regulations explains, forcing companies to obtain a PSD permit before they could simply adjust operating hours "would severely and unduly hamper the ability of any company to take advantage of favorable market conditions."  45 Fed. Reg. 52704.  In other words, a mere increase in the hours of operation, standing

alone, is not a "physical change or change in the method of operation." 40 CFR §51.166(b)(2)(iii).

But the District Court took this language a step further. It assumed that increases in operating hours (resulting in emissions increases at the old rate per hour) must be ignored even if caused or enabled by an independent "physical change . . . or change in the method of operation." §51.166(b)(2)(i). That reading, however, turns an exception to the first component of the definition into a mandate to ignore the very facts that would count under the second, which defines "net emissions increase" in terms of "actual emissions," §51.166(b)(3), during "the unit's actual operating hours," §51.166(b)(21)(ii); see also 57 Fed. Reg. 32328 (1992) ("[A]n increase in emissions attributable to an increase in hours of operation or production rate which is the result of a construction-related activity is not excluded from [PSD] review . . .").[7]

The Court of Appeals invoked one other source of support, the suggestion in the Reich opinions that a physical or operational change increasing a source's hours of operation, without an increase in the hourly emissions rate, cannot be a PSD "major modification." Duke continues to

—————

[7] Two Courts of Appeals agree. See *United States* v. *Cinergy Corp.*, 458 F. 3d 705, 708 (CA7 2006) ("[M]erely running the plant closer to its maximum capacity is not a major modification because it does not involve either a physical change or a change in the *method* of operation. If, however, a physical change enables the plant to increase its output, then, according to the EPA's interpretation, the exclusion for merely operating the plant for longer hours is inapplicable" (emphasis in original)); *Wisconsin Electric Power Co.* v. *Reilly*, 893 F. 2d 901, 916, n. 11 (CA7 1990) (the regulatory exclusion for increases in the hours of operation "was provided to allow facilities to take advantage of fluctuating market conditions, not construction or modification activity"); *Puerto Rican Cement Co.* v. *EPA*, 889 F. 2d 292, 298 (CA1 1989) ("[T]here is no logical contradiction in rules that, on the one hand, permit firms using *existing* capacity simply to increase their output and, on the other, use the potential output of *new* capacity as a basis for calculating an increase in emissions levels" (emphasis in original)).

rely on those opinions here, asserting that "there are no contrary Agency pronouncements." Brief for Respondent Duke 28. The Reich letters are not, however, heavy ammunition. Their persuasiveness is elusive, neither of them containing more than one brief and conclusory statement supporting Duke's position. Nor, it seems, are they unembarrassed by any "contrary Agency pronouncements." See, *e.g.*, App. 258 (Memorandum of Don R. Clay, Acting Assistant EPA Administrator for Air and Radiation (Sept. 9, 1988) (when "plans to increase production rate or hours of operation are inextricably intertwined with the physical changes planned," they are "precisely the type of change in hours or rate o[f] operation that would disturb a prior assessment of a source's environmental impact and should have to undergo PSD review scrutiny" (internal quotation marks and alterations omitted)); see also 57 Fed. Reg. 32328. In any event, it answers the citation of the Reich letters to realize that an isolated opinion of an agency official does not authorize a court to read a regulation inconsistently with its language.[8]

In sum, the text of the 1980 PSD regulations on "modification" doomed the Court of Appeals's attempt to equate those regulations with their NSPS counterpart. As a consequence, we have to see the Court of Appeals's construction of the 1980 PSD regulations as an implicit in-

───────────

[8] Duke now offers an alternative argument for applying the hourly emissions test for the PSD program: before a project can become a "major modification" under the PSD regulations, 40 CFR §51.166(b)(2)(i) (1987), it must meet the definition of "modification" under the NSPS regulations, §60.14(a). That sounds right, but the language of the regulations does not support it. For example, it would be superfluous for PSD regulations to require a "major modification" to be "a physical change in or change in the method of operation," §51.166(b)(2)(i), if they presupposed that the NSPS definition of "modification," which contains the same prerequisite, §60.14(a), had already been satisfied. The NSPS and PSD regulations are complementary and not related as set to subset.

validation of those regulations, a form of judicial review implicating the provisions of §307(b) of the Act, which limit challenges to the validity of a regulation during enforcement proceedings when such review "could have been obtained" in the Court of Appeals for the District of Columbia within 60 days of EPA rulemaking. See 42 U. S. C. §7607(b); see also *United States* v. *Cinergy Corp.,* 458 F. 3d 705, 707–708 (CA7 2006); *Wisconsin Electric Power Co.,* 893 F. 2d, at 914, n. 6. Because the Court of Appeals did not believe that its analysis reached validity, it did not consider the applicability or effect of that limitation here. We have no occasion at this point to consider the significance of §307(b) ourselves.

## IV

Finally, Duke assumes for argument that the Act and the 1980 regulations may authorize EPA to construe a PSD "modification" as it has done, but it charges that the agency has taken inconsistent positions and is now "retroactively targeting twenty years of accepted practice." Brief for Respondent Duke 37; see also Brief for State of Alabama et al. as *Amici Curiae.* This claim, too, has not been tackled by the District Court or the Court of Appeals; to the extent it is not procedurally foreclosed, Duke may press it on remand.

\*    \*    \*

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

————

No. 05–848

————

ENVIRONMENTAL DEFENSE, ET AL., PETITIONERS *v.*
DUKE ENERGY CORPORATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[April 2, 2007]

JUSTICE THOMAS, concurring in part.

I join all but Part III–A of the Court's opinion. I write separately to note my disagreement with the dicta in that portion of the opinion, which states that the statutory cross-reference does not mandate a singular regulatory construction.

The Prevention of Significant Deterioration (PSD) statute explicitly links the definition of the term "modification" to that term's definition in the New Source Performance Standard (NSPS) statute:

> "The term 'construction' when used in connection with any source or facility, includes the modification (as defined in section 7411(a) of this title) of any source or facility." 42 U. S. C. §7479(2)(C).

Section 7411(a) contains the NSPS definition of "modification," which the parties agree is the relevant statutory definition of the term for both PSD and NSPS. Because of the cross-reference, the definitions of "modification" in PSD and NSPS are one and the same. The term "modification" therefore has the same meaning despite contextual variations in the two admittedly different statutory schemes. Congress' explicit linkage of PSD's definition of "modification" to NSPS' prevents the Environmental Protection Agency (EPA) from adopting differing regula-

tory definitions of "modification" for PSD and NSPS. Cf. *IBP, Inc.* v. *Alvarez*, 546 U. S. 21, 34 (2005) (concluding that an "explicit reference" to a previous statutory definition prohibits interpreting the same word differently).

Section 7479(2)(C)'s cross-reference carries more meaning than the mere repetition of the same word in a different statutory context. When Congress repeats the same word in a different statutory context, it is possible that Congress might have intended the context to alter the meaning of the word. See *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427, 433 (1932). No such possibility exists with §7479(2)(C). By incorporating NSPS' definition of "modification," Congress demonstrated that it did not intend for PSD's definition of "modification" to hinge on contextual factors unique to the PSD statutory scheme. Thus, *United States* v. *Cleveland Indians Baseball Co.*, 532 U. S. 200 (2001), which analyzes the mere repetition of the same word in a different statutory context, carries little weight in this situation.

Likewise, this case differs from the circumstance we faced in *Robinson* v. *Shell Oil Co.*, 519 U. S. 337 (1997). In *Robinson*, we considered whether "employee," as used in §704(a) of Title VII of the Civil Rights Act of 1964, included former employees. We determined that under the clear language of the statute, certain statutory provisions using the term "employee" made sense only with respect to former employees or current employees, but not both. *Id.*, at 342–343. Accordingly, upon analyzing the context of §704(a), we were compelled to conclude that the term "employee" included former employees. This case does not present a similar situation. The statute here includes a statutory cross-reference, which conveys a clear congressional intent to provide a common definition for the term "modification." And the contextual differences between PSD and NSPS do not compel different meanings for the term "modification." *Robinson* is, therefore, inapplicable.

Even if the cross-reference were merely the equivalent of repeating the words of the definition, we must still apply our usual presumption that the same words repeated in different parts of the same statute have the same meaning. See *Atlantic Cleaners, supra*, at 433; *ante*, at 9. That presumption has not been overcome here. While the broadly stated regulatory goals of PSD and NSPS differ, these contextual differences do not compel different definitions of "modification." That is, unlike in *Robinson*, reading the statutory definition in the separate contexts of PSD and NSPS does not require different interpretations of the term "modification." EPA demonstrated as much when it recently proposed regulations that would unify the regulatory definitions of "modification." See 70 Fed. Reg. 61083, n. 3 (2005) (terming the proposal "an appropriate exercise of our discretion" and stating that the unified definition better serves PSD's goals).

The majority opinion does little to overcome the presumption that the same words, when repeated, carry the same meaning. Instead, it explains that this Court's cases do not compel identical language to be interpreted identically in all situations. Granting that point, the majority still has the burden of stating why our general presumption does not control the outcome here. It has not done so.