STRAS, Circuit Judge, concurring.
 

 The shareholders make a compelling case that the FHFA, created to stem the tide of a massive financial crisis, has grown into a monster. But judges are not superheroes; we cannot run to the rescue every time danger looms. Our job is to follow the law wherever it leads us. And here, the law leads to a single conclusion: the FHFA did not exceed its statutory powers by agreeing to the Net Worth Sweep, however troubling the scope of the
 Agency's powers and its willingness to seize them may be. I join the court's opinion and write separately to explain why.
 

 This shareholder lawsuit crashes into a roadblock before it can get started. The Housing and Economic Recovery Act, the statute creating the FHFA, includes an anti-injunction provision that prohibits any judicial action "to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator or a receiver."
 
 12 U.S.C. § 4617
 
 (f). The provision is broad but not boundless. As the court correctly concludes, it applies only when the FHFA has acted within the scope of its statutory powers and functions. The question here is whether agreeing to the Net Worth Sweep was an authorized act.
 

 The answer depends on the precise language Congress used in granting the FHFA its powers, because an agency may only exercise those powers Congress has given it.
 
 See
 

 La. Pub. Serv. Comm'n v. FCC
 
 ,
 
 476 U.S. 355
 
 , 374,
 
 106 S.Ct. 1890
 
 ,
 
 90 L.Ed.2d 369
 
 (1986) ("[A]n agency literally has no power to act ... unless and until Congress confers power upon it."). As relevant here,
 
 12 U.S.C. § 4617
 
 defines the FHFA's powers and functions as conservator. It does so in terms so broad that it authorizes the FHFA to do almost anything when it comes to Fannie and Freddie. Given this breadth, agreeing to the Net Worth Sweep fits within the scope of the Agency's powers.
 

 Two provisions of section 4617 make this clear. The first provision, the operational powers, allows the FHFA to run Fannie and Freddie on a day-to-day basis.
 
 See
 

 id.
 

 § 4617(b)(2)(B). It "may, as conservator or receiver[,] ... take over the assets of and operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity and conduct all business of the regulated entity."
 

 Id.
 

 § 4617(b)(2)(B)(i).
 

 The second provision, the incidental powers, is what sets this scheme apart. A conservator is traditionally required to act in the best interests of its ward, period.
 
 See
 

 Perry Capital LLC v. Mnuchin
 
 ,
 
 864 F.3d 591
 
 , 641 (D.C. Cir. 2017) (Brown, J., dissenting in part) (discussing the nature of a common-law conservator). But the incidental-powers provision allows the FHFA "as conservator or receiver ... [to] take any action authorized by this section, which the [FHFA] determines is in the best interests of the regulated entity
 
 or the [FHFA]
 
 ."
 
 12 U.S.C. § 4617
 
 (b)(2)(J)(ii) (emphasis added). That is no typo. The FHFA can operate critically important businesses, with trillions of dollars in assets and the financial support of the federal government, in its own best interests-apparently to the exclusion of the interests of the American people, Fannie and Freddie, and their shareholders.
 
 [8]
 

 In setting up the scheme in the way that it did, Congress came close to handing a blank check to the FHFA. I cannot see how the Agency's exceptionally broad operational authority could exclude the power to renegotiate an existing lending agreement, which is in essence what the Net Worth Sweep did. Fannie and Freddie owed money; the Net Worth Sweep changed the payment schedule and terms. This sort of action is within the heartland of powers vested in the officers or board of
 directors of any corporation.
 
 Accord
 

 Perry Capital
 
 ,
 
 864 F.3d at 607
 
 .
 

 To be sure, the Net Worth Sweep, as its name might suggest, forces the entities to relinquish all of their excess capital to the Department of the Treasury each quarter, leaving shareholders holding worthless stock. But whatever the harm to shareholders, the FHFA certainly considered the agreement to be in its own best interests, which is all that the incidental-powers provision requires. Congress charged the FHFA with ensuring that Fannie and Freddie continue "to accomplish their public mission[ ]" of "facilitat[ing] the financing of affordable housing for low- and moderate-income families."
 
 12 U.S.C. § 4501
 
 (2), (7). The Net Worth Sweep advanced this goal by protecting the entities from future market downturns or full-fledged crises.
 
 See
 

 Perry Capital
 
 ,
 
 864 F.3d at 607
 
 .
 

 Faced with exceptionally broad statutory language, the shareholders look long and hard for something-anything-to limit the FHFA's authority. They focus their efforts on the powers-as-conservator provision, which states that "[t]he Agency may, as conservator, take such action as may be ... appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."
 
 12 U.S.C. § 4617
 
 (b)(2)(D)(ii). Relying on the overarching statutory structure and common-law understanding of what conservators do, the shareholders argue that the powers-as-conservator provision creates a mandatory duty to preserve and conserve assets. Their theory is that the Net Worth Sweep is antithetical to this duty.
 

 The theory, though cleverly constructed, collapses on closer inspection. The powers-as-conservator provision uses "may ... take such action" to introduce the supposed duty to preserve and conserve assets. Ordinarily, the word "may is permissive," while "shall is mandatory." Antonin Scalia & Bryan A. Garner, Reading Law 112-15 (2012) (emphasis omitted). The usages throughout section 4617 follow this general pattern. "Shall" appears over one hundred times, enumerating mandatory duties across an array of situations.
 
 See, e.g.
 
 ,
 
 12 U.S.C. § 4617
 
 (a)(4)(A)-(B), (D), (b)(2)(E). "May" appears over fifty times, primarily describing acts that are within the Agency's discretion.
 
 See, e.g.
 
 ,
 

 id.
 

 § 4617(b)(1), (2)(B), (G), (J), (7)(A)(iii). Under the whole-statute and consistent-usage canons, there is no reason to doubt that the powers-as-conservator provision uses "may" in its normal, permissive sense, consistent with the rest of the statute.
 
 See
 

 King v. St. Vincent's Hosp.
 
 ,
 
 502 U.S. 215
 
 , 221,
 
 112 S.Ct. 570
 
 ,
 
 116 L.Ed.2d 578
 
 (1991) (describing the "cardinal rule that a statute is to be read as a whole");
 
 Envtl. Def. v. Duke Energy Corp.
 
 ,
 
 549 U.S. 561
 
 , 584,
 
 127 S.Ct. 1423
 
 ,
 
 167 L.Ed.2d 295
 
 (2007) (Thomas, J., concurring in part) (observing that there is a "presumption that the same words repeated in different parts of the same statute have the same meaning"). If "may" is permissive, as appears from the text of the powers-as-conservator provision, then the FHFA could not have acted outside of its authority by failing to do something that was optional in the first place.
 

 But even assuming that a mandatory duty to preserve and conserve assets exists, the FHFA's decision to enter the Net Worth Sweep did not violate it. To "preserve" and "conserve" means to "keep from injury, peril, or harm" and "protect from loss or harm."
 
 The American Heritage Dictionary of the English Language
 
 392, 1394 (5th ed. 2016). The essence of the shareholders' theory is that the FHFA had an overarching duty to protect Fannie's and Freddie's assets from injury, peril, loss, or harm. In the shareholders' view, the FHFA failed to do so.
 

 Yet the duty is not as categorical as the shareholders seem to think. The powers-as-conservator provision says that the FHFA may "take such action as may be ... appropriate to ... preserve and conserve the assets and property of" Fannie and Freddie.
 
 12 U.S.C. § 4617
 
 (b)(2)(D)(ii) (emphasis added). The word "appropriate," which means "[s]uitable for a particular person, condition, occasion, or place,"
 
 The American Heritage Dictionary of the English Language
 
 88 (5th ed. 2016), defines the range of "action[s]" the FHFA can take to fulfill the duty. Congress hardly could have picked a broader term. To fulfill the duty, all the FHFA must do is to take an action that is "suitable" for preserving and conserving assets. It need not pick the one the shareholders prefer or even the best alternative among a host of options.
 

 It is clear that the choice among suitable alternatives belongs to the FHFA, not to the shareholders and certainly not to the courts. Recall that the incidental-powers provision allows it to "take any action authorized by [ section 4617 ], which [it] determines is in the best interests of [Fannie or Freddie] or the [FHFA]."
 
 12 U.S.C. § 4617
 
 (b)(2)(J)(ii). The first part of the incidental-powers provision defines its scope: it applies only to an "action authorized by" section 4617.
 

 Id.
 

 A mandatory duty to preserve and conserve assets would limit the range of permissible actions that the FHFA can take. But if there are multiple appropriate actions that would preserve and conserve assets in a given situation, then all of them would be authorized by section 4617. In those situations, the incidental-powers provision lets the FHFA choose among the appropriate actions based on Fannie's, Freddie's, or its own best interests. The anti-injunction provision then takes center stage in any judicial challenge, insulating the FHFA's actions from judicial review so long as the FHFA has not exceeded its authority, such as by acting in a way that is not "suitable" for preserving and conserving assets or is not in the best interests of Fannie, Freddie, or itself.
 

 The Net Worth Sweep was among a range of actions "suitable" for preserving and conserving assets, well within the discretion granted to the FHFA under the statute, even if the shareholders would have preferred a different course of action. The Net Worth Sweep benefitted Fannie and Freddie, most notably by providing immediate relief from having to pay $19 billion in fixed annual dividends and commitment fees.
 
 See
 
 Fannie Mae, Quarterly Report (Form 10-Q) 12 (Aug. 8, 2012), http://goo.gl/bGLVXz; Freddie Mac, Quarterly Report (Form 10-Q) 10 (Aug. 7, 2012), http://goo.gl/2dbgey. It also prevented Fannie and Freddie from entering potential death spirals. They were obligated to make dividend payments under the previous arrangement based on their amount of outstanding debt, so during lean years when they borrowed more money from the Department of the Treasury, their future dividend payments would grow.
 
 See
 

 Roberts v. FHFA
 
 ,
 
 889 F.3d 397
 
 , 404-05 (7th Cir. 2018). Crushing dividend payments could have led the entities toward insolvency. The shareholders do not dispute these benefits.
 

 Rather, the shareholders fixate on the negative consequences of the Net Worth Sweep. The most serious negative consequence, at least from the shareholders' perspective, is that they can no longer share in Fannie's and Freddie's successes. Instead, both entities must pay out all excess capital on a quarterly basis to the Department of the Treasury, eliminating the possibility of shareholder dividends or the accumulation of capital by either entity. In addition to preventing the entities from accumulating capital, the Net Worth Sweep has resulted in the payment of
 more than $100 billion in additional dividends to Treasury, over and above what Fannie and Freddie would have paid under the previous arrangement.
 
 See
 
 FHFA,
 
 Table 2:
 

 Dividends on Enterprise Draws from Treasury
 
 , https://goo.gl/vHl8V0. It is hard to overstate the seriousness of the shareholders' concerns.
 

 But entering into the Net Worth Sweep was the FHFA's call, not ours, no matter how much the shareholders disagree with the FHFA's decision. Even accepting all of the shareholders' allegations as true does not negate the Net Worth Sweep's asset-preserving-and-conserving effects or take this action outside the broad discretion afforded to the FHFA under the Housing and Economic Recovery Act. Picking among different ways of preserving and conserving assets, deciding whose interests to pursue while doing so, and determining the best way to do so are all choices that the Housing and Economic Recovery Act clearly assigns to the FHFA, not courts.
 

 * * *
 

 Congress, intentionally or otherwise, may have created a monster by handing an agency breathtakingly broad powers and insulating the exercise of those powers from judicial review. Even so, clear statutory text dictates the outcome. I accordingly concur.
 

 The delegation is more harrowing still. The President can only remove the FHFA's director for cause; Congress cannot control its budget through the normal appropriations process; and the judiciary cannot interfere with the exercise of its powers or functions as conservator.
 
 See
 

 Collins v. Mnuchin
 
 ,
 
 896 F.3d 640
 
 , 666-67 (5th Cir. 2018) (per curiam);
 
 see also
 

 12 U.S.C. §§ 4512
 
 (b)(2), 4516(a), (f), 4617(f). But unlike the plaintiffs in
 
 Collins
 
 , the shareholders do not raise a constitutional challenge in this case. Rather, they ask us to decide only whether the FHFA has exceeded its statutory powers and functions.