**STA OF BALTIMORE—ILA CONTAINER ROYALTY FUND, Plaintiff,**

v.

**UNITED STATES of America.**

**Civ. No. H–84–1855.**

United States District Court, D. Maryland.

Nov. 19, 1985.

A. Adgate Duer, Paul B. Lang, Neil S. Kurlander and Niles, Barton & Wilmer, Baltimore, Md., for plaintiff.

Will E. McLeod, Tax Div., U.S. Dept. of Justice, Washington, D.C., and Larry D. Adams, Asst. U.S. Atty., Baltimore, Md., for defendant.

ALEXANDER HARVEY, II, District Judge.

In this civil action, plaintiff is seeking a refund of certain taxes which it alleges have been erroneously or illegally assessed and collected by the Internal Revenue Service (hereinafter the "IRS"). The plaintiff, STA of Baltimore—ILA Container Royalty Fund (hereinafter the "Fund") is here asserting that it is entitled to refunds of certain taxes it paid pursuant to the Federal Insurance Contributions Act, 26 U.S.C. §§ 3101 *et seq.* (hereinafter "FICA") and the Federal Unemployment Tax Act, §§ 3306 *et seq.* (hereinafter "FUTA"). Plaintiff contends that the payments upon which the taxes were assessed and paid do not constitute "wages" either under 26 U.S.C. § 3121 or under 26 U.S.C. § 3306.

Relying on various authorities, counsel for the government maintain that the payments in question did in fact constitute wages under §§ 3121 and 3306 and that accordingly the taxes were properly paid under the provisions of FICA and FUTA. In the alternative, counsel for the defendant have asserted that even if this Court were to conclude that the payments in question were not wages, the Fund did not timely file claims for refunds as to most of the taxes claimed in this suit.[1]

Following discovery by the parties, a pretrial conference was held and a Pretrial Order was entered. Most of the pertinent

---

1. Defendant contends that a claim for refund for the first quarter of 1978 was never filed by the plaintiff and that valid claims for refunds were not timely filed by plaintiff for all four quarters of 1979.

facts were stipulated by the parties. Pretrial briefs were filed, and the case came on for trial before the Court sitting without a jury. One witness testified at the trial, and numerous exhibits were entered in evidence. Findings of fact and conclusions of law, pursuant to Rule 52(a), F.R.Civ.P., are contained in this Opinion.[2]

## I

### The Facts

The essential facts are not in dispute. Plaintiff Fund was established by an Agreement and Declaration of Trust (hereinafter the "Trust Agreement") dated December 1, 1971 between the Steamship Trade Association of Baltimore, Inc. (hereinafter the "STA") and the International Longshoremen's Association and its five affiliated locals in the Port of Baltimore (hereinafter collectively referred to as the "ILA"). The Fund was established pursuant to the settlement of a labor dispute between the STA and the ILA which arose from the anticipated reduction in employment opportunities for longshoremen in the Port because of the introduction of containerization by employer members of the STA.

Before containerization was introduced by the shipping industry, cargo destined for ocean shipment would be placed on trucks or railroad cars at inland points of origin by non-ILA labor and shipped to the piers, where ILA longshoremen would remove the cargo from the trucks or railroad cars and load it aboard ship. The same system in reverse was used for imported cargo. ILA longshoremen would unload imported cargo from the ships and place it on trucks or railroad cars for shipment to inland destinations, where it would be unloaded by non-ILA labor.

The shipping of cargo in containers simplifies the process for shippers by eliminating the piecemeal loading and unloading of cargo at pierside. Once containerization came into use, cargo would be loaded into containers (or "stuffed") at its inland point of origin by non-ILA labor and unloaded at its ultimate point of designation (or "stripped") without any piecemeal handling

by longshoremen. The dockside activity of longshoremen would be limited merely to loading and unloading the bulk containers on and off ship, and longshoremen would not do any of the stuffing and stripping work.

In an effort to protect its members from the loss of employment opportunities caused by containerization, the ILA, in negotiating a new collective bargaining agreement for its members in 1971, took the position that it would not handle containers at all unless some provision were made for reimbursing longshoremen for the lost work which resulted from containerization. It was eventually agreed that the employer members of the STA (the direct employers of longshoremen in the Port of Baltimore) would make contributions to a container royalty fund, from which eligible ILA workers would receive, in addition to their regular wages, special compensation. Following negotiations, the STA agreed to establishing such a fund because the ILA had taken the position that pursuant to provisions of previous collective bargaining agreements all containers would have to be stuffed and stripped at pierside by longshoremen. Were this to occur, the very purposes of containerization would be defeated.

The Trust Fund itself is maintained by contributions from employer members of STA based upon the degree to which ships being loaded or unloaded could accommodate containers. To this end, ships were divided into four categories. At the lowest end of the scale were conventional or so-called "non-automated" ships. At the highest end of the scale were ships which had more than two hatches or more than forty percent of cargo-carrying capacity converted or fitted for containers. Inasmuch as the design of each ship determined the tonnage of cargo shipped in containers, contributions to the Fund made by STA members were in effect determined by the gross tonnage of cargo handled by non-ILA labor at the ultimate points of origin and destination.

---

**2.** Supplementary post trial briefs were likewise submitted by the parties.

Benefits from the Fund are distributed to all eligible employees. The term "employee" was defined in Section 1.03 of the 1971 Trust Agreement as follows:

   (a) Any employee covered by a collective bargaining agreement between the STA and the Union.

   (b) Employees of the administrative office staffs of the STA–ILA Pension Fund, Benefits Fund, Container Royalty Fund, and Seniority Board, Inc. who formerly were employed in the longshore industry as set forth in Section 1.03(a) above.

   (c) Union officials and union employees of the unions who have Collective Bargaining Agreements with the Association.

Section 2.03 of the 1971 Trust Agreement sets forth additional requirements for eligibility for payments from the Fund. This section has been amended three times since the Fund was established in 1971. The most recent amendment, that of 1975, requires that an employee must have worked 700 or more hours in at least one contract year beginning after September 30, 1973 to be eligible for payments from the Fund.

The actual amount paid to each employee is governed by the language of Section 2.04 of the Trust Agreement, as amended, which provides:

Each eligible Employee shall receive the same amount of benefits. The individual amount of benefits shall be determined by the Trustees, based upon the total amount of container contributions received, less reasonable and proper costs of administration and a reasonable reserve divided by the total number of Employees eligible under this Container Royalty Trust Agreement. Ten percent (10%) of each eligible Employee's allotted share of benefits shall be deducted therefrom, and forwarded to the International Longshoremen's Association, in accordance with a resolution duly approved by the ILA delegates at the International Convention. Such assignment shall be pursuant to a written voluntary authorization of the Employee.

This civil action has followed the failure of the IRS to act on various claims for refunds of taxes filed by the Fund. Those claims sought refund of employment taxes withheld from benefits paid from the Fund to ILA employees pursuant to both FICA and FUTA. Plaintiff asserts that its first claim for refund was filed on or about April 15, 1981 for the refund of taxes paid for calendar year 1977. Two similar claims for refund were allegedly filed on or about April 15, 1982 and on or about April 15, 1983 for the calendar years 1978 and 1979 respectively. The total amount which the Fund seeks to have refunded as erroneously or illegally assessed employment taxes for these three years is $1,248,975.69, plus interest.

The Fund initially regarded the payments made to the longshoremen as wages subject to FICA and FUTA taxes and reported them as such on each Form 941 which it filed with the IRS. The Fund now believes that it erred in regarding these royalty payments as wages and is here seeking judgment for the amount in question, together with attorneys' fees and costs.

## II

### The applicable statutes

Title 26, U.S.C. § 3102 requires every employer to deduct social security taxes from wages paid to employees. Section 3111 imposes a matching FICA tax on the employer. Section 3301 imposes an additional FUTA or unemployment tax on employers only.

Section 3121(a) broadly defines the term "wages" as "all remuneration for employment. . . ."[3] Section 3121(b) broadly defines "employment" as "any service, of whatever nature performed . . . by an employee for the person employing him . . ."[4] Taken together, subsections (a) and (b) of § 3121 define "wages," therefore, as "all remuneration" for "any service." The

---

**3.** A similar definition is contained in § 3306(b).

**4.** See also § 3306(c).

question presented here is whether payments to individual longshoremen from the Fund constituted "wages" as defined in FICA and FUTA.

## III

### *Discussion*

Plaintiff contends that payments to the Fund by STA employers and payments by the Fund to longshoremen did not constitute wages under the statutes in question because the payments were made to partially compensate longshoremen for lost work opportunities resulting from the introduction of containerization. Plaintiff accordingly argues that the payments in question did not compensate the longshoremen for services actually performed.

█ On the record here, this Court concludes that there is no merit to plaintiff's arguments. For the reasons set forth herein, this Court holds that contributions made by employer members of STA to the Container Royalty Fund and subsequently distributed to eligible longshoremen are "wages" pursuant to 26 U.S.C. § 3121 and § 3306 and that such amounts are therefore subject to taxation pursuant to provisions of FICA and FUTA.[5]

### (a)

### *The Trust Agreement as Amended*

Provisions of the Trust Agreement itself, as well as of subsequent amendments thereto, clearly indicate that the money distributed to eligible ILA members constitutes "supplementary pay" and that this pay is earned, derived or acquired as a result of prior services rendered by the employee. Indeed, Section 2.02 of the Agreement, captioned "General Purpose," flatly states that the purpose of the Fund is to provide "supplementary pay."

Section 2.03 of the original Trust Agreement of December 1, 1971, provided as follows:

All employees, as defined in Section 1.03(a)(b) and (c) hereof, who worked seven hundred hours or more in the long-

shore industry in the contract year of October 1, 1970 to September 30, 1971 shall be eligible to receive container royalty pay. Time off due to compensable injury shall be credited as time worked, at the rate of twenty hours per week for each week off.

This provision was part of the original benefit package which was negotiated between the STA and the ILA. It is apparent that employer members of STA were agreeing to make supplementary pay available only to those longshoremen who worked the requisite number of hours. This supplementary pay therefore constitutes "wages," under the definition of "all remuneration for employment" contained in § 3121(a).

Section 2.03 of the Agreement was first amended in 1972 to eliminate the requirement that the 700 hours be worked during the contract year of October 1, 1970 to September 30, 1971. Under the 1972 amendment, a worker could fulfill the requirement during any year in which payments were made into the Fund. This amendment thus allowed workers to receive supplementary pay during all subsequent contract years, not just the first year, provided, of course, that they worked the 700 hour minimum during the given contract year.

In 1973, Section 2.03 was again amended to increase the amount of prior services required to be rendered by an employee before he might be entitled to receive supplementary pay from the Fund. Section 2.03(a) provided that in addition to working or receiving credit for at least 700 hours during the paying contract year, the employee must also have received, or been eligible to receive, supplementary pay for any contract year prior to October 2, 1973. As amended, section 2.03(b) provided that those employees who had not received, or were not eligible to receive, supplementary pay prior to October 1, 1973, must work, or receive credit for, at least 700 hours in the

---

**5.** In view of the Court's conclusion in this regard, it is not necessary to consider whether claims for refund were in fact filed or were

timely filed by plaintiff for certain quarters of 1978 and 1979.

industry in at least five out of six consecutive contract years subsequent to October 1, 1973. Inasmuch as the 1973 amendment increases the work requirements which must be met for eligibility for the supplementary pay, it serves to illustrate that the receipt of such pay is conditioned upon specified prior employment service to STA employers.

The final amendment to the Agreement, ratified in 1975, illustrates the same point inasmuch as it too increases the work requirement. Under the 1975 Amendment, employees are eligible for supplementary pay from the Fund only if they actually worked (as distinguished from receiving credit for time off due to injury or sickness) at least 700 hours in at least one contract year beginning after September 30, 1973. The elimination of time off because of injury or sickness from the computation of the number of hours worked is yet another indication that the supplementary payments made to a longshoreman were intended to be based on or acquired through the prior rendering by such longshoreman of actual services. Being payment for services actually rendered, the supplemental pay is properly understood to be "wages," as defined in § 3121(a) and (b).

This conclusion is supported by consideration of the statutory exceptions contained in § 3121(a) in its definition of "wages." The various exceptions to "all remuneration for employment" include payments made from funds established on account of (1) retirement, (2) sickness or accident disability, (3) medical or hospitalization expenses in connection with sickness or accident disability, or (4) death. There are other specific exclusions, including any payments made by an employer under a state unemployment compensation law. Payments made to longshoremen from the Fund do not fall within any of the statutory exceptions to the FICA definition of taxable wages. It is apparent that these exceptions largely concern situations where payments have been made to or on behalf of an employee no longer in active service because of retirement, illness, accident, death or unemployment. In contrast, payments from the Fund are made only to actively employed workers who have previously worked the requisite number of hours.

In sum, Section 2.03 of the Agreement, as amended, requires that longshoremen meet specific hourly work requirements to be eligible for the supplementary pay. New longshoremen, fresh on the job, are not eligible for this supplementary pay, despite the fact that they too, from the very commencement of their employment, have less work opportunities available to them because of containerization. The supplementary pay provided by the Trust Fund is, therefore, based on services actually performed and is clearly "remuneration for employment" pursuant to § 3121(b).

This Court's conclusion that the payments in question are wages under FICA and FUTA is supported by consideration of the tax treatment of other payments made by employer members of STA to longshoremen pursuant to the collective bargaining agreement. Eligibility of longshoremen for vacation pay and for payment of Guaranteed Annual Income (hereinafter "GAI") are both also determined in much the same way as is eligibility for payments from the Fund. Both vacation pay and payments of GAI are determined by the number of previous hours worked by longshoremen.

Plaintiff has never contended that vacation pay and payments of GAI are not wages pursuant to FICA and FUTA. Treasury regulations unequivocally state that vacation allowances paid to an employee constitute wages under FICA and FUTA. *See* Treas.Reg. § 31.3121(a)–1(g). So-called "idle time" payments, similar to payments of GAI, have likewise been construed by the IRS to be wages taxable under FICA and FUTA. Rev.Rul. 76–217, 1976–1 C.B. 310. It is thus apparent that pay earned as a result of prior service rendered by the employee has consistently been treated by the IRS as wages under the FICA and FUTA definition. For similar reasons, the payments at issue here constitute wages taxable under FICA and FUTA.

### (b)

### Legislative History

In *Rowan Companies, Inc. v. United States*, 452 U.S. 247, 101 S.Ct. 2288, 68 L.Ed.2d 814 (1981), the Supreme Court held that the definition of wages under FICA and the definition of wages for income tax withholding should be interpreted in tax regulations in the same manner in the absence of statutory provisions to the contrary. In enacting the Social Security Amendments of 1983, Congress decided to override the *Rowan* decision. The purpose of those amendments was stated as follows:

The social security program aims to replace the income of beneficiaries when that income is reduced on account of retirement and disability. Thus, the amount of "wages" is the measure used both to define income which should be replaced and to compute FICA tax liability. Since the social security system has objectives which are significantly different from the objectives underlying the income tax withholding rules, *your committee believes that the amounts exempt from income tax withholding should not be exempt from FICA unless Congress provides an explicit FICA tax exclusion.* [Emphasis added] S.Rep. No. 98–23, 98th Cong., 1st Sess. p. 42 (1983 U.S.Code Cong. & Adm.News 183); H.Rep. 98–25 98th Cong., 1st Sess. p. 80 (1983 U.S.Code Cong. & Adm.News 299).

Similarly, in the Deficit Reduction Act of 1984, Congress stated that the 1983 amendments to the Social Security Act, which effectively overrode the *Rowan* decision, applied for all purposes other than payments made for employer-provided meals and lodging and that these amendments applied not only to remuneration paid after March 4, 1983, but also to all remuneration paid on or before that date where such remuneration was treated by the employer as wages when paid. *See* H.Rep. No. 98–432, Part II, 98th Cong. 2d Sess., p. 1658 (1984 U.S.Code Cong. & Adm.News 587). Recent action by Congress has therefore made it apparent that the term "wages" in FICA and FUTA should be broadly interpreted. In the absence of an explicit exclu-

sion by Congress, payments of the type involved here are includable as remuneration for employment and thus subject to these employment taxes.

### (c)

### Other Authorities

In *Educational Fund of Electrical Industry v. United States*, 305 F.Supp. 317 (S.D.N.Y.1969), the question before the Court was whether payments made pursuant to a collective bargaining agreement could properly be construed to be wages under 26 U.S.C. § 3401(a). In that case, employers of electricians had contributed a percentage of the weekly payroll into a Vacation Expense Fund, established pursuant to a collective bargaining agreement. The purpose of the Fund was to permit electricians to attend adult education courses for one week annually. Although the electricians who took these courses received no wages and were not performing services for their employers during the week in question, they were paid $140 for attending and completing the courses, the amounts to be taken out of extra funds in the Vacation Expense Fund. Relying on Treasury Regulation § 31.3401(a)–1 and Regulation Ruling 57–316, the District Court concluded that the electricians had performed or were available for the performance of services rendered to the employers in the past. The Court consequently held that the $140 payment was in effect compensation for services already rendered and therefore constituted wages within the meaning of § 3401.

On appeal, the Second Circuit affirmed. *Educational Fund of Electrical Industry v. United States*, 426 F.2d 1053 (2d Cir. 1970). At page 1056, the Court said the following:

The $140 payments were properly characterized as wages under § 3401(a), which defines wages as "all remuneration ... for services performed by an employee for his employer...." The $140 payments to those who attended the school represented part of the benefit package which was negotiated as part of the wage structure under the collective

bargaining agreement in effect between the employers and the Union as representative of the electrical workers. The payments ultimately derived from the employers and represented a portion of the agreed upon remuneration for services performed by the employees within the intent of § 3401(a), just as do payments from pension and vacation funds. *See* Treas.Reg. § 31.3401(a)–1(b); Rev. Rul. 57–316, (1957–2 Cum.Bull. 626).

Similar principles are applicable in this case, which involves §§ 3121 and 3306 rather than § 3401(a). Here, payments from the Fund to longshoremen represent a part of the benefit package negotiated between STA and ILA as a part of the collective bargaining agreement. The payments came from the employers, were ultimately paid to the employees and were a part of the agreed remuneration for services performed by the employees. Indeed, had the STA not agreed to the establishment of the Fund, it would undoubtedly have been required to pay higher wages to longshoremen who would be working longer hours by stuffing and stripping containers at dockside.

### (d)

### *Plaintiff's Contentions*

Since payments from the Fund to longshoremen are not for specific services rendered, plaintiff contends that they cannot be construed to be wages under FICA or FUTA. Citing *Central Illinois Public Service Company v. United States*, 435 U.S. 21, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978), plaintiff asserts that courts have on numerous occasions held that not all payments by employers to employees are wages. In *Central Illinois*, the Supreme Court had before it the question whether the reimbursement of meal expenses constituted "wages" subject to withholding under 26 U.S.C. § 3401(a). Citing *Royster Co. v. United States*, 479 F.2d 387 (4th Cir.1973) and *Acacia Mutual Life Ins. Co. v. United States*, 272 F.Supp. 188 (D.Md.1967), the Supreme Court observed that decided cases had indeed made the distinction between wages and income and had refused to equate the two in withholding or similar

controversies. 435 U.S. at 31, 98 S.Ct. at 922. The Court then went on to conclude that reimbursement for lunch expenses of employees did not constitute wages subject to withholding by the employer within the meaning of § 3401(a). In reaching its decision, the Court made the following observation:

> This is not to say, of course, that the Congress may not subject lunch reimbursements to withholding if in its wisdom it chooses to do so by expanding the definition of wages for withholding.

435 U.S. at 33, 98 S.Ct. at 923.

Plaintiff's reliance on *Central Illinois, Royster,* and *Acacia Mutual* is misplaced. Both *Central Illinois* and *Royster* involved reimbursements of employees for meals. In *Royster,* the Fourth Circuit held that where amounts paid by the employer to its salesmen to reimburse them for the cost of meals eaten in sales territory were not attributable to any service performed by the salesman, such payments did not constitute wages under FICA, FUTA and for purposes of income tax withholding. The Court noted that the salesmen in question were not on call during their lunch break, received a free lunch whether or not they made any sales on the day in question and performed no services during the lunch hour.

*Acacia Mutual* likewise involved facts quite different from those involved here. The payments at issue in *Acacia Mutual* were reimbursements made by a life insurance company to certain managers and agents for their expenses in attending the company's annual convention. Thus, the payments were not for prior services rendered but with the hope that by attending the company's convention the future performance of such employees might be improved.

■ The facts here are quite different. In this case, payments from the Fund, as discussed hereinabove, are conditioned on the number of hours of work performed and are therefore clearly attributable to prior services rendered to employers. Furthermore, both *Central Illinois* and *Aca-*

*cia Mutual* involved consideration of the term "wages" in § 3401(a). By overriding the *Rowan* decision, Congress has now made it clear that the definition of wages for purposes of income tax withholding is not the same as the definition of wages under FICA and FUTA. This Court concludes that the term "wages" in §§ 3121 and 3306 should be construed more expansively than the term "wages" in § 3401(a).

■ Plaintiff has further argued that amounts involved here cannot be considered to be wages because payments into the Fund are assessed on the basis of the tonnage of cargo handled and because each eligible employee receives the same amount of benefits. Such facts have little relevancy to the determination made by the Court in this case. As provided by the regulations, the basis upon which remuneration is paid is generally immaterial in determining whether or not the remuneration constitutes wages. *See* Treasury Regulations § 31.3121(a)-1(d) and 31.3306(b)-1(d). Were the law otherwise, the parties to a collective bargaining agreement could in effect determine which portion of an employee's compensation would be included in the social security wage base.

■ Plaintiff also contends that payments from the Fund are not wages because the Fund cannot be considered to be the "employer". However in *Otte v. United States*, 419 U.S. 43, 51–52, 95 S.Ct. 247, 253–54, 42 L.Ed.2d 212 (1974), the Supreme Court determined that the term "employer" under FICA and FUTA means the person having control of the payment of the wages. Here the Fund is clearly given that control pursuant to the Trust Agreement and therefore is deemed the "employer" for purposes of FICA and FUTA taxes. *See also, In Re Armadillo Corp.*, 410 F.Supp. 407, 409 (D.Col.1976). Moreover, the Fund has clearly been acting as an agent for the employers for many years and is therefore subject to the provisions of

FICA and FUTA. See 26 U.S.C. § 3504; Rev.Proc. 70–6, 1970–1 C.B. 420.

Finally, plaintiff relies on the testimony of the President of the STA and on an exhibit[6] admitted in evidence to support its argument that the Trust Agreement did not intend payments from the Fund to be treated as wages. But little weight can be given to the interpretation by STA's President to the language of the Trust Agreement itself. Moreover, the views of a Board of Arbitration (the so-called "Stein Award") contained at pages 6–8 of plaintiff's Exhibit No. 6, is entitled to even less weight.[7] The Trust Agreement was negotiated in 1971 and was amended several times in later years. What is controlling here is the language of the Trust Agreement, as amended, considered in the light of the applicable statutes and the circumstances existing in the Port of Baltimore during the years in question. What arbitrators may have said in deciding a matter before them in the Port of New York in 1960 is hardly pertinent to determining whether these payments were wages under FICA and FUTA.

## IV

### *Conclusion*

In sum, this Court concludes that there is no merit under the facts here and under the pertinent law to plaintiff's contention that payments from the Fund to longshoremen are not "wages" under provisions of FICA or FUTA. The language of the Trust Agreement itself, pertinent legislative history and applicable decisions of other federal courts support this Court's conclusion that the payments in question constitute "wages" under both § 3121 and § 3306. The amounts previously paid by the Fund for the tax years in question were therefore properly paid and should not be refunded. Accordingly, judgment will be

---

6. The exhibit in question, Plaintiff's Exhibit No. 6, is a 46–page document which includes a decision of a Board of Arbitration dated November 21, 1960 in an arbitration dispute between the New York Shipping Association and the ILA.

7. Defendant objected strenuously to the admission in evidence of plaintiff's Exhibit No. 6. In overruling defendant's objection, the Court stated that the weight to be given to the Exhibit would be determined at a later time.

entered in favor of the defendant, with costs.