RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0313p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

In re: QUALITY STORES, INC., et al.,

*Debtors.*

_____

UNITED STATES OF AMERICA,

*Appellant,*

*v.*

QUALITY STORES, INC., et al.,

*Appellees.*

No. 10-1563

_____

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 09-00044—Janet T. Neff, District Judge.

Argued: October 6, 2011

Decided and Filed: September 7, 2012

Before: BOGGS and STRANCH, Circuit Judges; and CARR, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Francesca U. Tamami, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Robert S. Hertzberg, PEPPER HAMILTON LLP, Detroit, Michigan, for Appellees. Mary B. Hevener, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Francesca U. Tamami, Gilbert S. Rothenberg, Kenneth L. Greene, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Robert S. Hertzberg, PEPPER HAMILTON LLP, Detroit, Michigan, Michael H. Reed, Nina M. Varughese, PEPPER HAMILTON LLP, Philadelphia, Pennsylvania, for Appellees. Mary B. Hevener, Christopher A. Weals, David R. Fuller, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., Robert A. Long, COVINGTON & BURLING LLP, Washington, D.C., for Amici Curiae.

_____

[*]The Honorable James G. Carr, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

———————————

## OPINION

———————————

JANE B. STRANCH, Circuit Judge.  This appeal arises from an adversary action filed in the bankruptcy court for the Western District of Michigan by Quality Stores, Inc., its affiliated companies, and certain employees (collectively Quality Stores) against the United States seeking a refund of $1,000,125 in taxes paid under the Federal Insurance Contributions Act (FICA).[1]  On stipulated facts and cross-motions for summary judgment, the bankruptcy court ordered a full refund, holding that payments Quality Stores made to its employees upon terminating their employment involuntarily due to business cessation constituted supplemental unemployment compensation benefits (SUB payments) that are not taxable as wages under FICA.  *Quality Stores, Inc. v. United States* (*In re Quality Stores, Inc.*), 383 B.R. 67 (Bankr. W.D. Mich. 2008).  On appeal, the district court affirmed, *United States v. Quality Stores, Inc. (In re Quality Stores, Inc.*), 424 B.R. 237 (W.D. Mich. 2010), and we now AFFIRM.

## I.  FACTS

Quality Stores was the largest agricultural-specialty retailer in the country serving farmers, hobby gardeners, skilled trade persons, and do-it-yourself customers. In October 2001, an involuntary Chapter 11 bankruptcy petition was filed against Quality Stores, Inc.  Within two weeks, Quality Stores answered the petition and consented to the entry of an order for relief.  Thereafter, Quality Stores's affiliated companies commenced voluntary Chapter 11 bankruptcy cases.[2]  In May 2002, the bankruptcy court confirmed the First Amended Joint Plan of Reorganization.

———————————

[1]Quality Stores is supported in this appeal by *amici curiae*, American Payroll Association and ERISA Industry Committee.

[2]The debtors are:  QSI Holdings, Inc. (f/k/a CT Holdings, Inc.), Quality Stores, Inc. (f/k/a Central Tractor Farm & Country, Inc.), Country General, Inc., F and C Holding, Inc., FarmandCountry.com, LLC, QSI Newco, Inc., QSI Transportation, Inc., Quality Farm & Fleet, Inc., Quality Investments, Inc., Quality Stores Services, Inc., and Vision Transportation, Inc.

Prior to November 1, 2001, Quality Stores closed sixty-three stores and nine distribution centers and terminated the employment of approximately seventy-five employees in the corporate office. After November 1, 2001, Quality Stores closed its remaining 311 stores and three distribution centers and terminated the employment of all remaining employees.

Quality Stores made severance payments to those employees whose employment was involuntarily terminated. The parties stipulated that the severance payments resulted directly from a reduction in force or the discontinuance of a plant or operation. Quality Stores made the severance payments pursuant to two separate plans.

Under the terms of the Pre-Petition Severance Plan, severance pay was based on job grade and management level in the organization. The President and CEO received eighteen months of severance pay. Senior management executives received twelve months of severance pay, while all other managers and employees received one week of severance pay for each full year of service. These severance payments were not tied to the receipt of state unemployment compensation, and they were not attributable to the provision of any particular services by the employees. Quality Stores made the severance payments on the normal payroll schedule. Salaried employees received an average of 11.4 weeks of severance pay, while hourly employees received an average of 4.2 weeks of severance pay.

The Post-Petition Severance Plan was designed to encourage employees to defer their job searches and dedicate their efforts and attention to the company by assuring them that they would receive severance pay if their jobs were eliminated. To be eligible for severance pay, an employee was required to complete the last day of service as scheduled. Company officers received between six and twelve months of severance pay, while full-time salaried and hourly employees who had been employed for at least two years received one week of severance pay for every full year of service, up to a maximum of ten weeks for salaried employees and five weeks for hourly employees. Those workers with less than two years of service received one week of severance pay.

Severance payments made under the Post-Petition Severance Plan were not tied to the receipt of state unemployment compensation, nor were they attributable to the provision of any particular services. The post-petition severance amounts were paid in a lump sum, however, because the companies were liquidating and it was not practical administratively to pay the amounts over time. Under the Post-Petition Severance Plan, on average, salaried employees received 5.2 weeks of severance pay, while hourly employees received 3.1 weeks of severance pay. About 900 employees did not receive any severance pay because they were hired immediately by successor companies.

Quality Stores did not require employees to prove that they were unemployed in order to receive severance pay under either plan. Because the severance payments constituted gross income to the employees for federal income tax purposes, Quality Stores reported the payments as wages on W-2 forms and withheld federal income tax. Quality Stores also paid the employer's share of FICA tax and withheld each employee's share of FICA tax. For the taxable quarters ending December 31, 1999, through June 30, 2002, Quality Stores filed timely Forms 941 reporting wages paid to employees and remitted the applicable FICA taxes.

Of the total $1,000,125 in FICA tax at issue, $382,362 is attributed to severance payments made under the Pre-Petition Severance Plan, consisting of $214,000 for the employer share and $168,362 for the employee share. Further, of the total amount of FICA tax at issue, $617,763 is attributed to severance payments made under the Post-Petition Severance Plan, consisting of $357,127 for the employer share and $260,636 for the employee share.

Although Quality Stores collected and paid the FICA tax, it did not agree with the Internal Revenue Service (IRS) that the severance payments constituted wages for FICA purposes. Quality Stores took the position that the payments made to its employees pursuant to the plans were not wages but instead constituted SUB payments that were not taxable under FICA.

Quality Stores asked 3,100 former employees to allow the company to file FICA tax refund claims on their behalf.  *See* Treas. Reg. § 31.6402(a)-2.  Of those contacted, 1,850 former employees allowed Quality Stores to pursue FICA tax refunds for them.

In September 2002, Quality Stores timely filed with the IRS fifteen Forms 843 seeking the refund of $1,000,125 in FICA tax.[3]  This figure consisted of $571,127 for the employer share and $428,998 for the employee share attributed to those employees who granted Quality Stores consent to pursue their claims.  When the IRS did not allow or deny the refund claims, Quality Stores filed an adversary action in the bankruptcy court in June 2005.

## II.  STANDARD OF REVIEW

When we consider an appeal from a district court judgment in a case that originated in bankruptcy court, we review the bankruptcy court's decision directly, without giving any deference to the district court's decision.  *Stevenson v. J.C. Bradford & Co.* (*In re Cannon*), 277 F.3d 838, 849 (6th Cir. 2002).  Because the bankruptcy court decided the case on stipulated facts and cross-motions for summary judgment, our review is *de novo*.  *See id.*

## III.  ANALYSIS

The concept of SUB payments first appeared in the 1950s and "evolved from the demand by organized labor for a guaranteed annual wage."  *Coffy v. Republic Steel Corp.*, 447 U.S. 191, 200 (1980).  Because the unions' real concern was the significant difference between average weekly earnings received when employed and the amount of unemployment benefits received when unemployed, the unions sought corporate supplementation of existing state unemployment compensation programs.  *See id.* Several industries adopted SUB plans, the purpose of which was to assure workers of employment security regardless of the number of hours actually worked, rather than to provide employees with additional compensation for work performed.  *Id.*   SUB

---

[3]The Forms 843 were filed by Central Tractor Farm & Country, Inc., Country General, Inc., Quality Farm & Fleet, Inc., and Quality Stores Services, Inc.

payments "cannot be compensation for work performed, . . . for they are contingent on the employee's being thrown out of work; unless the employee is laid off he will never receive SUB payments. In this sense, SUB's are analogous to severance payments: they are 'compensation for loss of jobs.'" *Id.* (quoting *Accardi v. Pa. R.R. Co.*, 383 U.S. 225, 230 (1966) ("[T]he cost to an employee of losing his job is not measured by how much work he did in the past . . . but by the rights and benefits he forfeits by giving up his job.") SUB payments are "in the nature of a reward for length of service, and do not represent deferred short-term compensation for services actually rendered." *Id.* at 205.

Consistent with these principles, Quality Stores developed two written plans to administer severance payments to the managers and hourly employees who permanently lost their jobs due to the cessation of business caused by bankruptcy. The related questions we must resolve are whether those payments constitute SUB payments under federal law and, if so, whether the payments are taxable under FICA.

## A. Background

Congress imposed the FICA tax on employee wages to fund the Social Security and Medicare programs. *Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir. 2006). Both the employer and the employee pay part of the tax. The employer collects the employee's share by deducting the tax from wages as they are paid. I.R.C. §§ 3101(a), 3102(a). The employer also pays a matching tax on the wages paid to the employee. I.R.C. § 3111(a).

Congress defined "wages" for FICA purposes (with certain exceptions) as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash . . . ." I.R.C. § 3121(a). "Employment," as used in the statute, means "any service, of whatever nature, performed . . . by an employee for the person employing him . . . ." I.R.C. § 3121(b). The Supreme Court has explained that the words

> "any service . . . performed . . . for his employer," with the purpose of the Social Security Act in mind[,] import breadth of coverage. They admonish us against holding that "service" can be only productive activity. We think that "service" as used by Congress in this definitive

> phrase means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer.

*Soc. Sec. Bd. v. Nierotko*, 327 U.S. 358, 365–66 (1946).  Thus, the Supreme Court held that back pay granted to an employee pursuant to an order of the National Labor Relations Board constituted "wages" taxable under FICA.  *Id.* at 369–70.  Likewise, we have construed FICA definitions broadly and inclusively, *Appoloni*, 450 F.3d at 190, and we generally favor "that interpretation of statutory provisions which calls for coverage rather than exclusion," *St. Luke's Hosp. Ass'n v. United States*, 333 F.2d 157, 164 (6th Cir. 1964); *United States v. Detroit Med. Ctr.*, 557 F.3d 412, 414 (6th Cir. 2009).  But in this case we must begin with the Supreme Court's particular instruction that SUB pay falls outside the broad statutory meaning of service performed by an employee for an employer because, by definition, an employee is not eligible for SUB pay until service to the employer has ended and such benefits provide compensation for the lost job.  *Coffy*, 447 U.S. at 200.

**B.  FICA, Federal Income Tax Withholding, and "Wages"**

 Whether SUB payments are "wages" under FICA is a complex question because the FICA statute does not expressly include or exclude SUB payments, nor do the Treasury regulations promulgated under FICA address the subject.  Mindful of the Supreme Court's admonition that SUB payments cannot, by their nature, be compensation for work performed, *id.*, we first ask whether Congress has provided any direction or insight into the proper treatment of SUB payments for tax purposes.

We observe that, for purposes of federal income tax withholding, I.R.C. § 3402, Congress adopted a definition of "wages" that is nearly identical to the definition of "wages" included in FICA.  In the income tax context, "wages" means "all remuneration . . . for services performed by an employee for his employer, including the cash value of all remuneration (including benefits) paid in any medium other than cash . . . ."  I.R.C. § 3401(a).  In addition to this definition of "wages," Congress expressly defined SUB payments for purposes of federal income tax withholding in a subsection of the statute

entitled, "**Extension of withholding to certain payments *other than wages*.**"  I.R.C. § 3402(o) (emphasis added).  In that subsection of the statute, Congress defined SUB payments as:

> amounts which are paid to an employee, pursuant to a plan to which the employer is a party, because of an employee's involuntary separation from employment (whether or not such separation is temporary), resulting directly from a reduction in force, the discontinuance of a plant or operation, or other similar conditions, but only to the extent such benefits are includible in the employee's gross income.

I.R.C. § 3402(o)(2)(A).  This statutory definition of SUB payments is repeated in the corresponding Treasury Regulation, § 31.3401(a)-1(b)(14)(ii).

Parsing this definition into its five separate elements, Congress has provided that a SUB payment is:  (1) an amount paid to an employee; (2) pursuant to an employer's plan; (3) because of an employee's involuntary separation from employment, whether temporary or permanent; (4) resulting directly from a reduction in force, the discontinuance of a plant or operation, or other similar conditions; and (5) included in the employee's gross income.

All payments Quality Stores made to its former employees, whether under the Pre- or Post-Petition Plan, satisfy this five-part statutory test to qualify as SUB payments.  The parties stipulated below that:  (1) Quality Stores made the payments to employees; (2) pursuant to company plans; (3) because of the employees' permanent separation from employment; and (4) resulting directly from a reduction in force or the discontinuance of a plant or operation.  Although the parties' stipulation did not contain any reference to gross income as contemplated by the fifth element of the statutory test, as a matter of law the SUB payments were included in the employees' gross incomes. *See* I.R.C. § 61 (generally "gross income means all income from whatever source derived" with certain inapplicable exceptions).  The statutory definition does not require that SUB payments be tied to an employee's receipt of state unemployment compensation benefits, nor does the statute make any distinction between periodic payments or one-time payments made in a lump sum.

Congress expressly provided that any payment made to an employee that meets the statutory definition of a SUB payment "shall be treated *as if it were a payment of wages* by an employer to an employee for a payroll period." I.R.C. § 3402(o)(1) (emphasis added). In our view, the necessary implication arising from this phrase is that Congress did not consider SUB payments to be "wages," but allowed their treatment as wages to facilitate federal income tax withholding for taxpayers. To the extent other plausible inferences might be drawn, the statute may be ambiguous.

Our objective when interpreting statutes is to give effect to the intent of Congress, and if that intent is clear, then both the courts and the government agency charged with implementing the statute, here the IRS, must give effect to that clear congressional intent. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 665 (2007). If a statute is silent or ambiguous, the question we ask is whether the agency's approach to interpretation is based on a permissible construction of the statute. *Id.*

Where ambiguity exists, we may use aids to statutory construction to help us resolve the ambiguity. We may consider the title of the statute and the legislative history leading to its enactment, although the title and history cannot limit the plain meaning of the statutory text. *See Maguire v. Comm'r of Internal Revenue*, 313 U.S. 1, 9 (1941); *Fairport, P. & E.R. Co. v. Meredith*, 292 U.S. 589, 594 (1934). Thus, we turn to the title and legislative history of § 3402(o) to assist us in determining whether the inference we read into the statute is consistent with congressional intent.

The title of § 3402(o) is: "**Extension of withholding to certain payments other than wages**." The phrase "other than wages" supports our conclusion that Congress knew that it was extending federal income tax withholding to payments "other than wages" when it enacted § 3402(o).

Moreover, the legislative history of the statute confirms our interpretation. When § 3402(o) was enacted in 1969, Congress recognized that SUB payments "are not subject to [federal income tax] withholding because *they do not constitute wages or*

*remuneration for services*."  S. Rep. No. 91-552, at 255–56 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2027, 2305 (emphasis added).  Because SUB payments "are generally taxable income to the recipient," however, Congress decided to require federal income tax withholding on SUB payments to alleviate any unexpected income tax burden on employees for the calendar year in which the payments were made.  *Id.*  Congress stressed "that *although these benefits are not wages*, since they are generally taxable payments they should be subject to withholding to avoid the final tax payment problem for employees."  *Id.* (emphasis added).  As a result of the enactment of § 3402(o), the "withholding requirements . . . on wages are to apply to these *non-wage* payments."  *Id.* at 2306 (emphasis added).

Because the title and legislative history clarify any ambiguity in the statute, we are convinced that Congress characterized SUB payments as "non-wages" and Congress enacted § 3402(o) simply to extend withholding to these "non-wage" payments to benefit taxpayers.  In light of this clear congressional intent, we approve the bankruptcy court's reasoning that if SUB payments are not "wages" but are only treated as if they were "wages" for purposes of federal income tax withholding, then SUB payments also are not "wages" under the nearly identical definition of that term found in the FICA statute.  The analytical bridge for this step in our reasoning arises from the Supreme Court's decision in *Rowan Cos. v. United States*, 452 U.S. 247, 255–57 (1981).

## C.  Application of *Rowan Cos. v. United States*

In *Rowan*, the Supreme Court examined the plain language and legislative history of § 3121(a) and § 3401(a) to conclude that Congress intended the term "wages" to carry the same meaning for purposes of FICA and federal income tax withholding.  *Id.* at 257.  By adopting virtually identical definitions of "wages" in the two statutes, Congress expressed an intent to coordinate the two statutory schemes "to promote simplicity and ease of administration."  *Id.*  The Court said that "[i]t would be extraordinary for a Congress pursuing this interest to intend, without ever saying so, for identical definitions to be interpreted differently."  *Id.*  Upon concluding that "wages" means the same thing under FICA as it does for federal income tax, the Supreme Court invalidated certain

Treasury regulations under which the IRS characterized meals and lodging provided to employees as "wages" under FICA but not as "wages" for purposes of federal income tax withholding. *Id.* at 249–50, 263.

The government contends that Congress legislatively superseded *Rowan* when it enacted the "decoupling amendment" as part of the Social Security Amendments of 1983, Pub. L. No. 98-21, 97 Stat. 65. Without doubt, the legislative history of the "decoupling amendment" reveals that Congress believed the objectives of the Social Security system were "significantly different from the objective[s] underlying the income tax withholding rules" and that "amounts exempt from income tax withholding should not be exempt from FICA unless Congress provides an explicit FICA tax exclusion." S. Rep. No. 98-23, at 42 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 183. Thus, the legislative history explains, "the determination whether or not amounts are includible in the Social Security wage base is to be made without regard to whether such amounts are treated as wages for income tax withholding purposes. Accordingly, an employee's 'wages' for Social Security tax purposes may be different from the employee's 'wages' for income tax withholding purposes." *Id. See also* H.R. Rep. No. 98-25(I), at 80 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 299; H.R. Conf. Rep. No. 98-47, at 148 (1983), *reprinted in* 1983 U.S.C.C.A.N. 404, 438.

This statement of congressional intent in the legislative history might change our analysis if Congress had actually passed a statute expressing it. But the actual language Congress used when it enacted the "decoupling amendment" did not achieve its intended effect as expressed in the legislative history. *See CSX Corp. v. United States*, 518 F.3d 1328, 1344 (Fed. Cir. 2008). The decoupling amendment reads:

> Nothing *in the regulations* prescribed for purposes of chapter 24 (relating to income tax withholding) which provides an exclusion from "wages" as used in such chapter shall be construed to require a similar exclusion from "wages" *in the regulations* prescribed for purposes of this chapter [22 relating to FICA]. Except as *otherwise provided in regulations* prescribed by the Secretary, any third party which makes a payment included in wages solely by reason of the parenthetical matter contained in subparagraph (A) of paragraph (2) shall be treated for purposes of this chapter and chapter 22 as the employer with respect to such wages.

I.R.C. § 3121(a) (emphasis added). Thus, "although the committee reports clearly state the intention to decouple the term 'wages' for purposes of income tax withholding and FICA," the statutory language actually "addresses the construction of the regulations." *CSX Corp.*, 518 F.3d at 1344. The decoupling amendment does not provide that "wages" must be treated differently for purposes of federal income tax withholding and FICA; rather, the amendment as written simply allowed the United States Treasury "'to promulgate regulations to provide for different exclusions from "wages" under FICA than under the income tax withholding laws.'" *Id.* (quoting *Anderson v. United States*, 929 F.2d 648, 650 (Fed. Cir. 1991) (also rejecting the government's "decoupling amendment" argument)). Importantly, the Secretary of the Treasury has not promulgated any regulations under the "decoupling amendment." *Id.* Therefore, because the language of the "decoupling amendment" is incongruent with its legislative history, we conclude under a plain reading of the statute that Congress did not statutorily supersede *Rowan* and that the case remains good law.

The government cites several other cases to support its view that the "decoupling amendment" abrogated *Rowan* and that later congressional action to make the "decoupling amendment" retroactive removed any doubt about its impact. *See New England Baptist Hosp. v. United States*, 807 F.2d 280, 284 (1st Cir. 1986); *Canisius Coll. v. United States*, 799 F.2d 18, 21–22 (2d Cir. 1986); *Temple Univ. v. United States*, 769 F.2d 126, 131–33 (3d Cir. 1985); *STA of Balt.-ILA Container Royalty Fund v. United States*, 621 F. Supp. 1567, 1575 (D. Md. 1985), *aff'd*, 804 F.2d 296 (4th Cir. 1986); *Robert Morris Coll. v. United States*, 11 Cl. Ct. 546, 550–52 (1987). These cases do not affect our analysis for two reasons. First, we approvingly cited *Rowan* and its holding long after these cases were decided. *Gerbec v. United States*, 164 F.3d 1015, 1026 n.14 (6th Cir. 1999). Second, these cases failed to focus on the plain meaning of the statute, which, as we have explained, is not in sync with its legislative history, *see CSX Corp.*, 518 F.3d at 1344, and these cases did not address the Secretary's failure to promulgate regulations to implement the "decoupling amendment."

We also do not agree with the government that the Supreme Court eroded *Rowan* when it decided *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007). In *Duke Energy*, the Supreme Court explained that it did not reach its decision in *Rowan* "simply because a 'substantially identical' definition of 'wages' appeared in each of the different statutory provisions." *Id.* at 575. Instead, the Court "relied on a manifest 'congressional concern for the interest of simplicity and ease of administration.' The FICA . . . regulations fell for failing to 'serve that interest,' not for defying definitional identity." *Id.* (internal citations omitted). The Supreme Court instructed that "[c]ontext counts," the government argues, because there is no "'effectively irrebuttable' presumption that the same defined term in different provisions of the same statute must 'be interpreted identically.'" *Id.* at 575–76 (internal citations omitted).

Putting aside that we are not dealing here with the same defined term in different provisions of the same statute, we reject the government's reliance on *Duke Energy* for the same reasons stated by the Federal Circuit in *CSX Corp.*, 518 F.3d at 1344 n.4. While the concern for simplicity and ease of administration "may be less compelling in other statutory settings, such as the one at issue in the *Duke Energy* case, there is nothing in the [Supreme] Court's opinion in [*Duke Energy*] to suggest that it would take a different view of the relationship between chapter 24 and chapter 21 of the Internal Revenue Code, where the *Rowan* Court found an enhanced need for consistency." *Id.*

We also cannot conclude that *Rowan* was eroded in *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704 (2011), where the Supreme Court held that stipends paid by the Mayo Foundation to medical residents who worked more than 40 hours per week but also engaged in academic pursuits constituted "wages" under FICA. Applying *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the Supreme Court deferred to a Treasury regulation on the subject. *Mayo Found.*, 131 S. Ct. at 712–13. The government contends that the Supreme Court rejected *Rowan's* framework for examining the validity of Treasury regulations when it noted that "[s]ince *Rowan* . . . the administrative landscape has changed significantly." *Id.* at 713.

We cannot agree.  The aspect of *Rowan* that informs our present analysis is its instruction that the statutory term "wages" should be interpreted consistently in the statutes governing FICA and the federal income tax.  The Supreme Court did not address that aspect of *Rowan* in *Mayo Foundation.*  Rather, the Court concerned itself with *Rowan's* status as a pre-*Chevron* case that accorded less deference to a Treasury regulation than is now required under *Chevron*.  *Id.* at 713–14.  *Mayo Foundation* adds nothing of significance to our legal analysis.

The government argues that, even if *Rowan* remains good law, the result reached by the bankruptcy court in favor of Quality Stores is inconsistent with the thrust of *Rowan*.  While the Supreme Court construed the FICA and income tax definitions of "wages" similarly in order to effectuate a congressional intent to promote "simplicity and ease of administration," *Rowan*, 452 U.S. at 257, here, the government argues, the bankruptcy court's decision results in different treatment of SUB payments for purposes of FICA and income-tax withholding, which is precisely the situation *Rowan* sought to avoid.

This argument misses the target.  Congress imposed federal income tax withholding on SUB payments because they qualify as gross income, not because they are "wages."  Reading the definitions of "wages" found in the FICA and federal income tax statutes consistently, SUB payments do not constitute "wages" under either statutory scheme.

*Rowan* remains good law, and the Federal Circuit agrees with us on this point. *CSX Corp.*, 518 F.3d at 1344 & n.4.  That court, however, confined the congressional definition of SUB pay in I.R.C. § 3402(o) to federal income tax withholding only and did not rely on *Rowan* to conclude that the same statutory definition applies to FICA tax. *Id.* at 1340–42, 1345.  In doing so, the Federal Circuit appears to have created an inconsistency within its own law.  *Id.* at 1344 (observing that *Anderson v. United States*, 929 F.2d 648 (Fed. Cir. 1991), "held that the term 'including benefits' in the definition of wages under FICA must be accorded the same meaning as the identical term used in the income tax statutes.")  By contrast to the analysis of the Federal Circuit, we rely on

*Rowan* to reach the conclusion that if Congress decided to treat SUB payments as if they were "wages" for purposes of federal income tax withholding, then the same definition must apply under FICA.

**D. Summary**

Accordingly, we conclude, under the stipulated facts of this case, that the payments Quality Stores made to its employees pursuant to the Pre- and Post-Petition Plans qualify as SUB payments under I.R.C. § 3402(o). Because Congress has provided that SUB payments are not "wages" and are treated only as if they were "wages" for purposes of federal income tax withholding, such payments are not "wages" for purposes of FICA taxation.[4] We are cognizant of our prior decision construing payments made to teachers in exchange for relinquishment of their statutory tenure rights as "wages" taxable under FICA, *Appoloni*, 450 F.3d at 196, but in that case we did not examine the meaning of SUB pay or the interpretation of I.R.C. § 3402(o). Nor did we examine those issues in *Gerbec*, 164 F.3d at 1026, where we held that certain awards representing lost back pay and future wages amounted to compensation paid to the employee because of the employer-employee relationship and thus were taxable under FICA. We have also considered our prior holding that payments employees received from the residual balance of a terminated supplemental employment benefit trust fund constituted "wages" for the purpose of the FICA tax because they were solely derived from employer contributions and were contingent on past or present employment. *Sheet Metal Workers*

---

[4]Other subsections of the statute allow federal withholding with respect to certain payments made to employees for annuities and sick pay. I.R.C. § 3402(o)(1)(B) & (C). The government argues it was unnecessary for Congress to exclude annuity payments and sick pay from the FICA definition of "wages" if, under I.R.C. § 3402(o), those payments were already considered non-wage payments for FICA purposes.

The bankruptcy court responded to this argument by noting that "the reason for these exclusions is explained by the disparate nature of the types of payments." *In re Quality Stores, Inc.*, 383 B.R. at 76. For instance, annuity payments are considered "remuneration for services" and thus are deemed to be "wages" for both FICA and federal income tax withholding, but Congress specifically excluded annuity payments from the definition of "wages" under chapters 21 (FICA) and 24 (federal income tax) of the Tax Code. *See* I.R.C. §§ 3121(a)(5)(B), 3401(a)(12)(B). By enacting § 3402(o), the court reasoned, Congress gave employees the option to request federal income tax withholding on annuity payments to avoid an unexpectedly large income tax bill. By contrast, SUB payments are not "remuneration for services," so such payments do not initially fall within the statutory definition of "wages." Therefore, there was no need for Congress to specifically exclude them from FICA tax, yet federal income taxpayers were provided the same option for federal income tax withholding. *In re Quality Stores, Inc.*, 383 B.R. at 76. The same analysis applies to sick pay. *Id.*

In light of *Coffy* and our entire analysis, we adopt the bankruptcy court's reasoning on this point.

*Local 141 Supplemental Unemployment Benefit Trust Fund v. United States*, 64 F.3d 245, 250–51 (6th Cir. 1995). In that case, the fund did not argue that the residual balance payments "were supplemental unemployment benefits which are exempt from FICA" tax. *Id.* at 251 n.4. Therefore, these prior cases do not impact our analysis here.

## E. IRS Revenue Rulings Conflict With Congressional Intent

Having detailed the reasons why we affirm the bankruptcy court, we also explain why we do not adopt the government's other arguments or follow the IRS revenue rulings the government cites. In many respects, we find the arguments and revenue rulings to be inconsistent with the intent of Congress as expressed in the statutes and the legislative history as discussed above.

The government argues that, prior to 1950 when SUB pay had not yet been conceived, "dismissal pay" was specifically excluded from the definition of "wages" under FICA, Social Security Act Amendments of 1939, Pub. L. No. 76-379, ch. 666, 53 Stat. 1360, 1384, codified at I.R.C. § 1426(a)(4) (1939 Code), and Congress repealed the exclusion for "dismissal pay" in the Social Security Act Amendments of 1949, thus making all "dismissal pay" subject to FICA tax, *see* Pub. L. No. 81-734, ch. 809, 64 Stat. 477. The Federal Circuit adopted the government's position, *see CSX Corp.*, 518 F.3d at 1334, but we do not agree with the government's historical assessment of the law.

Prior to 1950, most "dismissal pay" was *not* excluded from the FICA definition of "wages." Only a small category—those payments an employer was not legally required to make—was excluded. S. Rep. No. 76-734, at 54 (1939) (accompanying H.R. 6635, amending the Social Security Act). The Social Security Act Amendments of 1949 eliminated the exclusion for "dismissal payments" an employer was not legally required to make:

> Section 1426(a) as amended by the bill contains no provision comparable to paragraph (4) of existing law which excludes from the term "wages" dismissal payments which the employer is not legally required to make. Therefore, a dismissal payment, which is any payment made by an employer on account of involuntary separation of the employee from the service of the employer, will constitute wages

> . . . irrespective of whether the employer is, or is not, legally required to
> make such payment.

H.R. Rep. No. 1300, at 124 (1949).  In any event, we agree that at the time SUB pay was conceived in the 1950s, all "dismissal payments" made to employees qualified as FICA "wages" for purposes of taxation.

When employers began adopting plans under collective bargaining agreements to fund trusts for the purpose of making SUB payments to employees in the event of unexpected job lay-off or termination, it was critical that SUB payments not be characterized as "wages."  If SUB payments constituted "wages," then unemployed workers could not qualify for unemployment benefits under most states' laws, and the unavailability of unemployment benefits would largely defeat the purpose of SUB payments.  Employers thus sought the guidance of the IRS to determine whether payments from their SUB plans would be characterized as taxable "wages."

In 1956, based on the specific facts of the employer plan before it, the IRS determined that SUB payments did not constitute "wages" for purposes of taxation under FICA and the Federal Unemployment Tax Act ("FUTA") because eight elements were met:  (1)  the benefits were paid only to unemployed former employees who were laid off by the employer; (2) eligibility for benefits depended on meeting prescribed conditions after employment terminated; (3) benefits were paid by trustees of independent trusts; (4) the amount of weekly benefits payable was based on state unemployment benefits, other compensation allowed under state unemployment laws, and the amount of straight-time weekly pay after withholding all taxes and contributions; (5) the duration of the benefits was affected by the fund level and the employee's seniority; (6) the right to benefits did not accrue until a prescribed period after termination of employment; (7) the benefits were not attributable to the rendering of any particular services; and (8) no employee had any right, title, or interest in the fund until such employee was qualified and eligible to receive benefits.  Rev. Rul. 56-249, 1956-1 C.B. 488.  The IRS ruled, however, that even SUB payments meeting this definition

must still be included in the gross income of the recipient for federal income tax purposes.[5] *Id.*

The IRS subsequently considered a SUB plan that was unilaterally instituted by the employer without union negotiation, Rev. Rul. 58-128, 1958-1 C.B. 89, and a SUB plan that allowed the employer to pay benefits to employees directly without use of a separate trust,  Rev. Rul. 60-330, 1960-2 C.B. 46.  In both situations, the IRS ruled that the SUB payments were excluded from FICA "wages" because the plans were otherwise similar in all material respects to the plan evaluated in Rev. Rul. 56-249.  The IRS also ruled that the same principles applied if lump sum payments were made, rather than payments over a period of time.  Rev. Rul. 59-227, 1959-2 C.B. 13.

In 1960, Congress amended the Internal Revenue Code to provide an income-tax exemption for SUB trusts.  Pub. L. No. 86-667, 74 Stat. 534 (1960).  In doing so, Congress defined SUB pay as "benefits which are paid to an employee because of his involuntary separation from the employment of the employer (whether or not such separation is temporary) resulting directly from a reduction in force, the discontinuance of a plant or operation, or other similar conditions . . . ."  74 Stat. 535.  This definition remains in the statute today, I.R.C. § 501(c)(17), and it closely mirrors the SUB pay definition Congress later added to the federal income tax withholding statute in 1969, as discussed earlier in this opinion.  I.R.C. § 3402(o)(2)(A).  Because Congress knew that employers had developed a variety of SUB plans, it wished to facilitate the tax-exempt status of SUB plans because they provide "worthwhile benefits, but at the same time are not in competition with profitmaking enterprises."  S. Rep. No. 86-1518 (1960), *reprinted in* 1960 U.S.C.C.A.N. 3203, 3205.

In 1971, after Congress added its own definitions of SUB pay to § 501(c)(17) and § 3402(o)(2)(A), the IRS issued another revenue ruling in which it considered an agreement between an employer and a union under which the employer made awards to employees who were separated from service based on the employees' rate of pay and

---

[5]There are substantial differences in the IRS eight-part test and the five-part test Congress later adopted, as discussed previously in this opinion.

years of service. Relying on the "dismissal payment" amendment to the Social Security Act that took effect in 1950 and the "dismissal payment" regulation in the federal income tax withholding regulations, Treas. Reg. § 31.3401(a)-1(b)(4), the IRS determined that the "dismissal payments" constituted taxable "wages" under FICA.[6] Rev. Rul. 71-408, 1971-2 C.B. 340. Soon thereafter, the IRS reached the same conclusion in addressing a "dismissal payment" where the employer and the employee had contractually agreed that the employer would make "dismissal payments" if the employer terminated the employee early. Rev. Rul. 74-252, 1974-1 C.B. 287.

In 1977, the IRS determined that a SUB plan, although not directly tied to the receipt of state unemployment compensation benefits, was substantially the same as the plan discussed in Rev. Rul. 56-249. Rev. Rul. 77-347, 1977-2 C.B. 362. Because the payments made under that plan did not disqualify the employees from receiving state unemployment benefits, the IRS found that the payments were SUB payments as defined by Congress in § 3402(o) and were not subject to FICA tax. The IRS modified and amplified Rev. Rul. 56-249 and Rev. Rul. 58-128 to reflect the change in the Tax Code that Congress effectuated in 1969 when it enacted § 3402(o). Thus, Rev. Rul. 77-347 is consistent with both our conclusion and that of the bankruptcy court that because SUB payments are not "wages" and are only treated as if they were "wages" under § 3402(o), SUB payments also are not "wages" under FICA.

The IRS later reversed itself on this point, however, stating that the "definition of SUB pay under section 3402(o) is not applicable for FICA . . . . SUB pay is defined solely through a series of administrative pronouncements published by the Service." Rev. Rul. 90-72, 1990-2 C.B. 211. To be exempt from "wages" under FICA, the IRS reasoned, SUB payments must be made to involuntarily separated employees pursuant to a plan that is designed to supplement the receipt of state unemployment compensation. *Id.* Moreover, the IRS ruled that payments in a lump sum are not considered linked to

---

[6]Treasury Regulation § 31.3401(a)-1(b)(4) provides that "dismissal payments" are "[a]ny payments made by an employer to an employee on account of dismissal, that is, involuntary separation from the service of the employer, [which] constitute wages regardless of whether the employer is legally bound by contract, statute, or otherwise to make such payments."

state unemployment compensation and therefore are not excludable from FICA "wages." *Id.* The IRS specified that it issued the ruling to "restore[] the distinction between SUB pay and dismissal pay by re-establishing the link between SUB pay and state unemployment compensation set forth in Rev. Rul. 56-249." *Id.*

In *CSX Corp.*, 518 F.3d at 1346, the Federal Circuit adopted the IRS's eight-part administrative definition of SUB pay set out in Rev. Rul. No. 56-249 and Rev. Rul. 90-72 rather than the express statutory definition provided by Congress in § 3402(o). That court characterized the payments before it as "dismissal pay" subject to FICA tax. *Id.*

By contrast, we resolve the tension between the statutory enactments and the IRS revenue rulings in favor of the expressed will of the legislature. Applying the five-part definition that Congress enacted in § 3402(o)(2)(A), the payments made by Quality Stores to its former employees qualify as SUB payments, not "dismissal pay." And as we have explained, SUB payments are not subject to FICA tax.

We decline to imbue the IRS revenue rulings and private letter rulings with greater significance than the congressional intent expressed in the applicable statutes and legislative histories. Congress, not the IRS, prescribes the tax laws; IRS revenue rulings "have only such force as Congress chooses to give them, and Congress has not given them the force of law." *Dixon v. United States*, 381 U.S. 68, 73 (1965); *Aeroquip-Vickers, Inc. v. Comm'r of Internal Revenue*, 347 F.3d 173, 181 (6th Cir. 2003) (observing we do not give *Chevron* deference to revenue rulings because "the IRS does not invoke its authority to make rules with the force of law"). The power of the IRS to "administer a federal statute and to prescribe rules and regulations to that end is not the power to make law . . . but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." *Dixon*, 381 U.S. at 74. The rights of the taxpayer are defined by the statute, which establishes the standard by which such rights must be measured. *Id.* And where a promulgated Treasury regulation has no power to alter a statute Congress enacted, neither does a revenue ruling. S*ee id.* at 75. In appropriate circumstances we may give substantial judicial deference to longstanding and reasonable interpretations of IRS regulations and revenue rulings, *Envtl. Def.*, 549 U.S. at 575, but

in this case we conclude, for all the reasons we have discussed, that the IRS has not taken congressional intent fully into account.

## IV.  CONCLUSION

We agree with the Federal Circuit on one final important point: "We acknowledge that this issue of statutory construction is complex and that the correct resolution of the issue is far from obvious." *CSX Corp.*, 518 F.3d at 1340.  While the Supreme Court may ultimately provide us with the correct resolution of these difficult issues under the law as it currently stands, only Congress can clarify the statutes concerning the imposition of FICA tax on SUB payments.  Our role is to interpret the statutory law as it presently exists, and we have done that today.  Accordingly, the judgment of the district court is AFFIRMED.